Brenda EDWARDS, et al., Appellants,

v.

**DISTRICT OF COLUMBIA, a municipal corporation, et al.**

No. 85–6150.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1986.

Decided June 12, 1987.

Richard Gladstein, with whom Lynn Cunningham, Washington, D.C., was on the brief, for appellants.

Beverly J. Burke, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief for appellee, the District of Columbia.

Nathan Dodell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys. and Gershon M. Ratner, Associate Counsel for Litigation, Anthony J. Ciccone, Jr., Trial Atty., U.S. Dept. of Housing and Urban Development, Washington, D.C. were on brief, for federal appellees, Pierce and White.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL,* Senior District Judge.

Opinion for the Court filed by Chief Judge WALD.

Concurring opinion filed by Circuit Judge WILLIAMS.

Dissenting opinion filed by Senior District Judge WILL.

WALD, Chief Judge:

The United States Housing Act of 1937, as amended, provides that the Secretary of the Department of Housing and Urban Development may only approve an application from a local public housing agency for demolition of a federally funded housing project if the local agency complies with certain conditions set out in the statute. In this case, the District of Columbia's local public housing agency has submitted a demolition application without complying with the conditions, and, accordingly, the Secretary has not approved the application. Plaintiffs maintain, however, that the conditions in the statutory section on demolition themselves impose independent duties on the local agency and secure to the affected tenants correlative rights to the performance of those duties, regardless of whether or not the Secretary has approved the application. We disagree, and affirm the District Court's dismissal of plaintiffs' complaint.

## I. BACKGROUND

### A. *The Demolition Schema*

The United States Housing Act of 1937 (USHA), Pub.L. No. 75–412, 50 Stat. 888 (codified as amended at 42 U.S.C. §§ 1437–1440) (1982 & Supp. III 1985), is a fairly typical federal grant-in-aid program: in exchange for various types of federal funds, local public housing agencies (PHAs) must comply with an assortment of conditions. Among other things, the Act regulates rent calculation, 42 U.S.C. § 1437a, lease provi-

sions, 42 U.S.C. § 1437d(*l*), tenant selection, 42 U.S.C. § 1437d(c)(4)(A), and demolition or disposition of housing projects, 42 U.S.C. § 1437p.

At issue in this case are the requirements for demolition of public housing projects. Section 1437p of 42 U.S.C., titled "Demolition and disposition of public housing," reads, in relevant part, as follows:

(a) ...

The Secretary may not approve an application by a public housing agency for permission ... to demolish ... a public housing project or a portion of a public housing project unless the Secretary has determined that—

(1) ... the project or portion of the project is obsolete as to physical condition, location, or other factors, making it unusable for housing purposes, or no reasonable program of modifications is feasible to return the project or portion of the project to useful life; or in the case of an application proposing the demolition of only a portion of a project, the demolition will help to assure the useful life of the remaining portion of the project;

....

(b) ...

The Secretary may not approve an application or furnish assistance under this section ... unless—

(1) the application from the public housing agency has been developed in consultation with tenants and tenant councils, if any, who will be affected by the demolition or disposition and contains a certification by appropriate local government officials that the proposed activity is consistent with the applicable housing assistance plan; and

(2) all tenants to be displaced as a result of the demolition or disposition will be given assistance by the public housing agency and are relocated to other decent, safe, sanitary, and affordable housing, which is, to the maxi-

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

mum extent practicable, housing of their choice, including housing assisted under section 1437f of this title.

This section is implemented by regulations published at 24 C.F.R. § 970 (1986).

## B. *The Proceedings in This Case*

Fort Dupont, consisting of approximately 300 units in southeast Washington, D.C., is one of the District of Columbia's (District) federally subsidized low income housing projects. Although the Department of Housing and Urban Development (HUD) had approved modernization funds for twenty-eight Fort Dupont units in 1977, the rehabilitation work was not performed, and by 1981 escalating costs led the District, through the local PHA, to apply instead for permission to demolish the units. Two years later, the District updated this application to seek permission for demolition of 112 units. HUD has neither approved nor denied the District's request for demolition.

Plaintiffs' factual assertions, which we accept as true in reviewing a dismissal on the pleadings for failure to state a claim, allege *"de facto,"* Pl. Br. *passim,* or "constructive" demolition. According to plaintiffs, (1) HUD has not made the determination required by § 1437p(a)(1), and the District has (2) not consulted with the affected tenants, as required by § 1437p(b)(1), (3) not provided for the decent, safe, sanitary,

and affordable relocation of these tenants, taking their choices for new quarters into account as much as possible, as required by § 1437p(b)(2), (4) not kept the vacant units in a state of good repair, and (5) made no attempt to rerent these units. Even though HUD has yet to approve the application and the units still stand, plaintiffs assert that the District has "embarked upon a program to demolish public housing," Pl. Rep. Br. at x, without fulfilling the statutory prerequisites.

■ Plaintiffs, nine current and former residents of Fort Dupont,[1] sued both HUD and the District for declaratory and injunctive relief and damages. Using 42 U.S.C. § 1983 (1982) as a vehicle, plaintiffs asserted that the District violated their rights secured by § 1437p of the USHA, its implementing regulations, 24 C.F.R. § 970 (1986), and the due process clause of the fifth amendment. Plaintiffs claimed additionally, under the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1982), that HUD acted illegally in failing to deny the District's demolition application. Finally, plaintiffs argued that both the District and HUD infringed their rights as third-party beneficiaries of the Annual Contributions Contract (ACC) between the District and HUD, pursuant to which public housing is operated.[2]

---

1. Plaintiffs brought this lawsuit as a class action pursuant to Fed.R.Civ.P. 23(b)(1) & (2), "on behalf of themselves and on behalf of a class consisting of all current Fort Dupont public housing tenants, and all such tenants who have been or will be relocated to substandard housing from Fort Dupont.... [T]he class consists of approximately one hundred and fifty ... households." Pl. Comp. at 8, J.A. at 15. The District Court dismissed the entire complaint on the pleadings, and did not rule on the motion for class certification.

2. Plaintiffs also asserted, initially, that HUD had failed to approve modernization funds for Fort Dupont. They claimed that HUD violated the APA in so doing, and that the District violated plaintiffs' rights under 42 U.S.C. § 1437*l* by failing to apply properly for such funds. After realizing that HUD had in fact approved the funds, plaintiffs dropped these claims.

Plaintiffs also claimed that the District violated its lease agreements with them by failing to maintain the project in a decent, safe, and sanitary condition, and by terminating tenancies

without following statutory prerequisites. These claims arise under 42 U.S.C. § 1437d(*l*), which stipulates that "[e]ach public housing agency shall utilize leases which" require such maintenance and termination. The District Court dismissed these claims, holding that "actions for breach of lease agreements belong in the state[ ] courts...." 628 F.Supp. at 342.

Plaintiffs had initially acknowledged that normally these lease-based claims belong in local court, but argued that a distinction be drawn in this case to permit suits alleging particularly egregious lease violations to be maintained in federal court. Rec. No. 33 at 49–51. We disagree. Such a distinction would recognize the existence of § 1437d(*l*) rights to the very things that § 1437d(*l*) merely stipulates must be required in each lease. That is, the only rights created by § 1437d(*l*) itself are rights to a lease that in turn requires proper maintenance and termination. Plaintiffs do not claim that their leases fail to require these things; rather, they argue that the District has breached its duties regarding proper maintenance and termination

The District Court dismissed the entire complaint on the pleadings. *Edwards v. District of Columbia*, 628 F.Supp. 333 (D.D.C.1985). The court's treatment of plaintiffs' § 1983 claim against the District for violation of alleged § 1437p rights was somewhat confusing, however. The court first noted that it would not reach this claim, 627 F.Supp. at 338–39 n. 4, but later expressly concluded that § 1437p(b)(2), requiring appropriate relocation, fails to provide a right against constructive demolition. 628 F.Supp. at 342–43. It held that § 1437p(b)(2) "is only relevant once a demolition application has been approved and plaintiffs are displaced pursuant to the approved demolition." 628 F.Supp. at 342. The court also rejected plaintiffs' due process argument. 628 F.Supp. at 343.

The court further held that plaintiffs' APA claim against HUD for failing to deny the demolition application is not ripe, since the application is admittedly incomplete, and HUD is therefore under no obligation to do anything. 628 F.Supp. at 338–39. Finally, the court dismissed plaintiffs' third-party beneficiary claim, holding that "[p]laintiffs have simply not demonstrated a cognizable claim against HUD for the alleged breach of the ACC by the District. Should plaintiffs have any claims for breach of contract, they would lie against the District, not HUD." 628 F.Supp. at 345.

## II. CONSTRUCTIVE DEMOLITION

### A. *When Do Federal Statutes Create "Rights"?*

Plaintiffs' case turns on whether or not § 1437p provides them rights against constructive demolition of their public housing units. Plaintiffs' channel for enforcing their alleged § 1437p rights is 42 U.S.C. § 1983, which provides that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or ... the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

(emphasis added). In *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that § 1983 means what it says, and provides a remedy for the deprivation not only of rights secured by the federal Constitution but also of rights secured by federal laws.[3] *Thiboutot* did not, though, indicate how a court should determine whether or not a law secures a right.[4]

contained *within* those leases. We agree with the District Court that § 1437d(*l*) does not create federal rights to proper maintenance and termination, and that these claims belong in local court.

**3.** In *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court emphasized that two separate questions must be asked when a plaintiff alleges through § 1983 that her rights secured by a federal law have been violated. The question that most immediately concerns us is "whether the statute at issue ... [is] the kind that create[s] enforceable 'rights' under § 1983." 453 U.S. at 19, 101 S.Ct. at 2625–26. The other question asks "whether Congress ha[s] foreclosed private enforcement of [the] statute in the enactment itself." 453 U.S. at 19, 101 S.Ct. at 2626. This latter inquiry serves as a reminder that § 1983 is a congressional enactment to enforce federal rights against state actors, and can therefore be supplanted by another congressionally created enforcement scheme. In other words, this latter inquiry buttresses separation of powers principles, reminding the courts that they must follow Congress' lead in enforcing federal statutory rights.

The District maintains that Congress, by providing that HUD shall not approve a demolition application unless certain conditions are met, has foreclosed private § 1983 enforcement of § 1437p. However, while HUD certainly can withhold demolition approval until the District meets the requisite conditions, plaintiffs' constructive demolition claim is that *regardless* of HUD's actions the District's behavior violates their § 1437p rights. Were plaintiffs correct in their contention that § 1437p secures rights against constructive demolition, HUD's power to withhold demolition approval would be of little value.

**4.** This question comprises the first of four factors used to determine whether to imply a cause of action from a federal statute. *See Cort*

One year later, the Court had occasion to flesh out the contours of *Thiboutot.* At issue in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), was the "bill of rights" provision, 42 U.S.C. § 6010, of the Developmentally Disabled Assistance and Bill of Rights Act (DDA), which declares that

Congress makes the following *findings* respecting the rights of persons with developmental disabilities:

(1) Persons with developmental disabilities have a *right* to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities *should* be designed to maximize the developmental potential of the person and *should* be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an *obligation* to assure that public funds are not provided to any institutio[n] ... that—(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such person; or (B) does not meet the following minimum standards....

(emphases added). Despite the specific language of rights and obligations, the Court concluded that § 6010

*v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). Although now the second factor of the *Cort* test, which emphasizes a more direct and rigorous search for congressional intent, is given the greatest weight, *see Merrell Dow Pharmaceuticals Inc. v. Thompson,* — U.S. ——, 106 S.Ct. 3229, 3234 n. 9, 92 L.Ed.2d 650 (1986) (listing post-*Cort* Supreme Court cases stressing strict fidelity to congressional intent in implied cause of action field), the first factor of the *Cort* test does look to whether "the plaintiff [is] 'of the class for whose *especial* benefit the statute was enacted' ...—that is, does the statute create a federal right in favor of the plaintiff?" 422 U.S. at 78, 95 S.Ct. at 2088 (quoting *Texas & Pac. Ry. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis added)). Supreme Court cases that employed the *Cort* test initially emphasized this first factor, and concentrated particularly on whether or not the statute in question speaks in terms of specific rights and duties. *See, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 690 n. 13,

does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of "findings" and, as such, is too thin a reed to support the rights and obligations read into it by the court below. The closest one can come in giving § 6010 meaning is that it justifies and supports Congress' appropriation of money under the Act and guides the Secretary in his review of state applications for federal funds.

451 U.S. at 19, 101 S.Ct. at 1541.

The Court's restrictive reading of the bill of rights provision is best understood in relation to its explication of how Congress must speak if it wishes to create rights under its spending power through grant-in-aid programs:

The legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the "contract." ... There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal monies, it must do so unambiguously.... By insisting that Congress speak with a clear voice, we enable the States to exer-

99 S.Ct. 1946, 1954–55 n. 13, 60 L.Ed.2d 560 (1979); *see also* Brown, *Pennhurst* as a Source of Defenses for State and Local Governments, 31 Cath.U.L.Rev. 449, 458–59 (1982). Similarly, our discussion below will also focus on the presence of such language, as well as its specificity.

We believe the analogy to be sound despite the Court's subsequent movement in implied cause of action jurisprudence away from *Cort*'s first factor and toward its second factor. This movement toward an exclusive focus on whether Congress intended to create a private cause of action indicates the Court's growing realization that it ought not conflate the question of whether a statute creates rights with the question of whether it creates a private cause of action to enforce those rights. However, in a case like ours, where a separate congressionally created cause of action, § 1983, clearly exists, then the focus on whether the statute creates rights is appropriate, and the value of the first *Cort* factor is retained. *See also* note 11, *infra.*

cise their choice knowingly, cognizant of the consequences of their participation. 451 U.S. at 17, 101 S.Ct. at 1540. Applying this mandate to the bill of rights provision of the DDA, the Court evidently gave greater weight to the precatory portion of the provision, "Congress makes the following findings ...," and less weight to the explicit language of rights and obligations contained within the three subsections of § 6010.

*Pennhurst*, it seems, attempts to distinguish statutory provisions that announce broad policy goals or general preferences from those that dictate specifically what the relevant governmental officials may and may not do. While policy goals and general preferences leave much room for governmental officials to determine the means by which these goals and preferences are to be carried out, and therefore are ambiguous regarding what duties are owed to which citizens, specific language of obligation narrowly cabins the discretion of officials, and, by the same terms, secures rights to a specific class of people. The task for each court in determining whether a provision in a grant-in-aid program secures rights is to ask whether Congress has spoken with a "clear voice" so that states and local governmental units may "exercise their choice knowingly."

Indeed, the courts of appeals in the aftermath of *Pennhurst* have, for the most part, upheld rights claims in statutes that dictate specific action and leave little room for choice, while rejecting rights claims in statutes that merely indicate broad preferences. For example, this circuit held that

42 U.S.C. § 1437d(k), which provides that HUD "shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure ...," does secure public housing tenants a right to an administrative grievance procedure. *Samuels v. District of Columbia*, 770 F.2d 184 (D.C.Cir.1985). While not mandating the precise method by which the administrative grievance procedure must be carried out, the statute still constrains official discretion in a significant and clear fashion.[5]

On the other hand, *Boatowners and Tenants Association v. Port of Seattle*, 716 F.2d 669 (9th Cir.1983), found the declaration in 33 U.S.C. § 551 (1982) "that water terminals are essential at all cities and towns located upon harbors ... and that at least one public terminal should exist ... open to the use of all on equal terms" to be too general to provide a right to plaintiffs to challenge the defendants' rates. Similarly, in *Perry v. Housing Authority*, 664 F.2d 1210 (4th Cir.1981), the court held that 42 U.S.C. § 1437, which provides that Congress' purpose in passing the USHA was "to assist the ... States ... to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income ...," fails to secure rights. The provision is simply a "precatory statement[ ] of Congress' designs." 664 F.2d at 1215.

*Polchowski v. Gorris*, 714 F.2d 749 (7th Cir.1983), is particularly helpful here because in construing contiguous statutory provisions the court held that one secures

---

**5.** Other cases that point to narrow language of obligation in holding that federal laws secure rights include *Coos Bay Care Center v. Oregon Dep't of Human Resources*, 803 F.2d 1060 (9th Cir.1986) (Section 1396a(a)(13)(A) of 42 U.S.C. (Supp. III 1985) provides that "[a] State plan for medical assistance must provide for payment ... of the hospital ... through the use of rates ... which ... are reasonable and adequate ... to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality...."); *Student Coalition for Peace v. Lower Merion School Dist. Bd. of School Directors*, 776 F.2d 431 (3d Cir.1985) (Section 4071(a) of 20 U.S.C. (Supp. III 1985) provides that "[i]t shall be un-

lawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access ... to ... any students who wish to conduct a meeting within that limited open forum on the basis of the ... political ... content of the speech at such meetings."); *Alexander v. Polk*, 750 F.2d 250 (3d Cir.1984) (7 C.F.R. § 246.24(a) (1978) provides that "[w]henever a person is determined to be ineligible to participate in the [Supplemental Food Program for Women, Infants, and Children, 42 U.S.C. § 1786 (1982),] the person shall be notified in writing of the reason for his ineligibility and his right to a fair hearing.").

rights and the other doesn't. Section 3789g of the Justice System Improvement Act controls the confidentiality of information obtained under the Act. 42 U.S.C. § 3789g (1982 & Supp. III 1985). Section 3789g(a), which the court held does secure a right, provides that "no recipient of assistance under the provisions of this chapter shall use or reveal any research ... information furnished under this chapter by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this chapter." Section 3789g(b), which the court held does not secure a right, provides that "the Office of Justice Programs shall assure that the security and privacy of all information is adequately provided for...." While the latter subsection is "essentially administrative in nature," the former subsection "clearly imposes an affirmative obligation upon every person possessing statistical information to use it only for its intended purpose." 714 F.2d at 751.[6]

Finally, contrary to the dissent, we read the Supreme Court's recent decision in *Wright v. City of Roanoke Redevelopment and Housing Authority,* ── U.S. ──, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), as consistent with both *Pennhurst* and our holding today. In *Wright,* the Court held that the combination of the Brooke Amendment to the USHA, § 1437a, which provides that a low-income family "shall pay as rent" a specified percentage of its income, and the accompanying HUD regulations, which construe "rent" to include a reasonable amount for the use of utilities, afford public housing tenants a cause of action under

§ 1983 for overbilling by the local PHA for their utilities. The Court cited *Thiboutot, Pennhurst,* and *Middlesex* as establishing the basic rules of decision for determining whether § 1983 can be utilized to remedy violations of federal statutes. 107 S.Ct. at 770, 775. It explicitly rejected defendant's claim that § 1437a and the implementing HUD regulations provide no enforceable rights, by explaining that the Brooke Amendment itself contains a "mandatory limitation" on rent, while the regulations "expressly require[ ]" a reasonable utility charge. The Court concluded that "the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not, as [defendant] suggests, beyond the competence of the judiciary to enforce." 107 S.Ct. at 775.

The dissent construes *Wright* as departing from *Pennhurst*'s mandate that local governmental units be made cognizant of the specific nature of their obligations under federal grant-in-aid programs, arguing that "there is no such requirement when the statute at issue uses mandatory, rather than merely precatory, language." Diss. op. at 668. We, however, read *Pennhurst* and *Wright* together as standing for the proposition that Congress must employ "sufficiently specific and definite" statutory language in order to create rights and, at the same time, give notice to the relevant governmental unit of its obligations in relation to such rights. The issue to be decided in each case, of course, is whether the statute is in fact "sufficiently specific and definite" so as to create the

---

**6.** It should be noted that the courts of appeals have decided other *Thiboutot*-type cases that do not look so carefully at the specificity of the obligations involved. A section of the USHA provides that "[e]very contract for annual contributions shall provide that the public housing agency shall comply with ... requirements pertaining to [t]he establishment of tenant selection criteria which gives preference to [certain types of families] and which is designed to assure that ... the project will include [other types of families]...." 42 U.S.C. § 1437d(c)(4)(A). Despite the apparent narrowing of the dictates to the local PHAs through the specification of preferences, the court in *Phelps v. Housing Auth.,* 742

F.2d 816 (4th Cir.1984), held that the section creates no rights.

On the other hand, § 5(f) of the Hawaiian Admission Act, Pub.L. No. 86–3, 73 Stat. 4, 6 (1959), provides that Hawaii must hold certain lands "as a public trust ... for the betterment of the conditions of native Hawaiians ... and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States." Despite the great breadth of this obligation, especially in the concept of public trust, the court in *Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n,* 739 F.2d 1467 (9th Cir.1984), held that the section does create rights.

rights alleged by the plaintiffs; while we agree with the dissent that "the statute in *Wright* sets forth specific obligations," diss. op. at 668, *i.e.*, an enforceable rent ceiling, we are obviously in disagreement with the dissent as to the obligations that § 1437p creates.

### B. *Does § 1437p Secure Public Housing Tenants Rights Against Constructive Demolition?*

 The specific question before us in this case is whether there is a cause of action under § 1983 when a PHA intentionally seeks to circumvent the carefully crafted prerequisites of § 1437p in order to pave the way for demolishing units in a federally funded housing project, *regardless of whether the Secretary approves the demolition application or the units are actually (or about to be) demolished.* As we have discussed above, in detailing how courts have construed federal grant-in-aid statutes in response to rights claims, the statutory language in question must be such that the affected state or local governmental unit can accept federal funds with the knowledge that it is undertaking certain obligations, with correlative rights being secured to the affected citizens. We hold that the language of § 1437p does not provide the type of right that plaintiffs seek, and that the legislative history is likewise of no help to their argument.

As quoted above, 42 U.S.C. § 1437p provides, in relevant part, that HUD "may not approve an application" for demolition "unless"

(1) the Secretary has determined that the units in question are unusable for housing purposes, or it is not reasonable to restore the units in question, or the demolition of the units in question will help preserve the remaining units, and

(2) the PHA's application has been developed in consultation with the tenants, and

(3) the affected tenants are aided by the PHA and relocated to decent, safe, sanitary, and affordable housing, which is of their choice, if at all possible.

It is clear from § 1437p that Congress intended the demolition of public housing units to occur only after the Secretary's determination regarding the physical state of the units, the PHA's consultation with the affected tenants and provision for their appropriate relocation, and the Secretary's approval of the demolition application. However, the language of § 1437p creates only one independent obligation:[7] "The Secretary may not approve an application ... unless ..." he has made the relevant determination and the PHA has consulted with the tenants and provided for their appropriate relocation. Were the Secretary to approve a demolition application without these prerequisites having been satisfied, the affected tenants would have a strong case against the Secretary under the APA to rescind the approval.[8] *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action ... found to be ... not in accordance with law...."). Likewise, if the statute had provided that "A PHA shall not seek to demolish a public housing project or units thereof except by consulting with tenants and providing for their decent, safe, sanitary, and affordable relocation," then the plaintiffs in this case would prevail in a § 1983 action against the District, because

---

7. Of course, the very existence of § 1437p entails that a PHA may not raze a federally funded housing project without complying with § 1437p procedures. *See* note 12 *infra* and accompanying text.

8. In a case decided before the demolition provision of the USHA was enacted, HUD was ordered, pursuant to the National Housing Act, 12 U.S.C. §§ 1715z–3(a)(2) & 1713(*l*) (1982), to "act in an appropriate manner and for a rational reason related to the achievement of the statutory objectives" in deciding to demolish a HUD-owned project. *Cole v. Lynn,* 389 F.Supp. 99, 102 (D.D.C.1975). *But see Sadler v. 218 Hous. Corp.,* 417 F.Supp. 348, 359 (N.D.Ga.1976) (permitting HUD to demolish a federally subsidized project because its "decision ... was reached only after full consideration of the alternatives ... and was wholly consistent with its obligations under the National Housing Act"). Besides not being § 1437p cases, *Cole,* which plaintiffs cite in their favor, and *Sadler,* are inapposite here because they involved review of HUD's demolition *approval,* whereas here, of course, HUD has failed to grant such approval.

the language in this hypothetical statute prescribes an obligatory method of *seeking* demolition approval and is specific enough to warn the PHA about what it is getting into before it accepts federal funds. Section 1437p as written, however, does not establish independent duties on the part of the PHAs; instead, it creates conditions precedent that must occur before the Secretary approves a demolition application (and, necessarily, before actual demolition). As in contract law, these conditions precedent do not, by themselves, constitute independent duties.[9]

The legislative history that plaintiffs cite does not permit any different reading of § 1437p. Plaintiffs correctly point out that the relevant legislative history *does* indicate that Congress clearly intended demolition as a last resort. *See* S.Rep. No. 142, 98th Cong., 1st Sess. 38, *reprinted in* 1983 U.S.Code Cong. & Admin.News 1768, 1809, Pl. Br. Add. at 12 ("[T]he Committee believes that every effort should be made to retain the present stock of public housing."); H.R.Rep. No. 123, 98th Cong., 1st Sess. 36, Pl. Br. Add. at 14 ("The purpose of this provision is to ensure that the public housing stock remains available for housing low income families."); Staff of the House Subcommittee on Housing and Community Development of the Committee on Banking, Finance and Urban Affairs, 98th Cong., 1st Sess., Compilation of the Domestic Housing and International Recovery and Financial Stability Act of 1983, at 319 (Comm. Print 1984), Pl. Br. Add. at 18 ("[I]t must be emphasized that the demolition or sale of any public housing project in this country should only be permitted as a last resort."). However, neither these documents nor the floor debate reveals any congressional intention to create independent duties for the PHAs in § 1437p.[10]

■ In short, neither the language nor the legislative history of § 1437p creates rights in public housing tenants against the

---

**9.** *See* 3A A. Corbin, Corbin on Contracts § 634 (1960) ("If the condition consists of some action by some person, it may properly be said not to be performed; but such non-performance is not a breach of contract unless he promised to render the performance—to perform the condition.").

**10.** Section 1437p was added to the USHA by the Housing and Urban-Rural Recovery Act of 1983 and by the Domestic Housing and International Recovery and Financial Stability Act, both enacted as part of the Supplemental Appropriations Act of 1984, Pub.L. No. 98-181, § 214(a), 97 Stat. 1153, 1184 (1983). Prior to this enactment, Congress provided in § 202(a) of the Housing and Community Development Act of 1980, Pub.L. No. 96-399, 94 Stat. 1614, 1628 (1980) (codified at 42 U.S.C. § 1437*l* (f), *repealed by* § 1437p) that

[w]here an application made pursuant to this section proposes demolition of any low-rent housing project or any portion of such a project, the Secretary may not approve such application unless the Secretary determines that—

(1) timely replacement of the units in such project will be undertaken by the public housing agency;

(2) the total cost of providing such replacement housing is less than the total cost of rehabilitation of such project, except that the Secretary may waive such requirement where the Secretary determines that the demolition is necessary to meet the purposes of this section; and

(3) lower income families displaced by such proposed demolition will be provided with decent, safe, sanitary, and affordable housing.

The accompanying conference report merely restated the statutory language. H.R.Conf.Rep. No. 1420, 96th Cong., 2d Sess. 90 (1980). Thus, even the predecessor to § 1437p was written as a conditions statute, prescribing no independent duties to the local PHAs.

Plaintiffs cite one other aspect of the legislative history to support their argument that the District's attempt to relocate Fort Dupont tenants is illegal. The report accompanying the 1983 House bill suggests that the Secretary determine that the PHA has not "engaged in a policy or practice of vacating the units" in order to meet the requirement that the project be "substantially unoccupied" before demolition. H.R.Rep. No. 123, 98th Cong., 1st Sess. 37 (1983), Pl. Br. Add. at 15. However, the requirement that a project be substantially unoccupied before demolition approval did not make it into the final law. Plaintiffs acknowledge this, but maintain that "the prohibitions in both the House and Senate bills against relocating tenants prior to approval were retained." Pl. Rep. Br. at 4. Plaintiffs do not indicate where such prohibitions appear, but rather seem to be reiterating their constructive demolition argument, which we reject in the text. For a discussion of how the implementing regulations appear to address preapproval relocation, *see* note 13, *infra.*

constructive demolition of their units.[11] Although an actual demolition may not occur without the Secretary's approval, which in turn requires a physical condition determination, tenant consultation, and provision for appropriate relocation, nothing in the statute prevents the District from *seeking* such demolition in the allegedly insensitive way it has chosen.[12]

11. In the only case to resolve a § 1983 claim to federal statutory rights against the demolition of public housing, the court held that the provisions relied upon "are broad statements of purpose, not substantive provisions creating new federal rights." *Hernandez v. Pierce*, 512 F.Supp. 1154, 1159 (S.D.N.Y.1981) (rejecting claims versus New York City by tenants of city-owned, nonfederally funded buildings that had been approved for demolition). The provisions, 42 U.S.C. § 1441a(c) (1982), 42 U.S.C.S. § 5313 historical note (1982), and 42 U.S.C.S. § 1441 historical note (Supp.1986), all contain clearly precatory language, involving congressional declarations and findings about preserving existing housing, minimizing displacement of tenants, and conserving existing neighborhoods.

We should note that although the *Hernandez* court did explicitly rule on the issue of whether the statutes in question create federal rights, the court also held that since plaintiffs concededly could not imply a private cause of action under the statutes, they could *therefore* not bring a § 1983 action. The court argued that otherwise "a party that could not bring a private suit under a particular statute could simply restyle its grievance as a section 1983 action for violation of the very same statute." 512 F.Supp. at 1159. *Hernandez*, decided a year after *Thiboutot* had held that § 1983 can serve as a cause of action to remedy rights secured by federal laws, is clearly incorrect in stating that the absence of a cause of action in the statute upon which plaintiffs rely for their rights claims necessitates the dismissal of a § 1983 cause of action based on those alleged rights. As we stated in *Samuels v. District of Columbia*, 770 F.2d 184, 194 (D.C.Cir.1985), § 1983 itself is an *express* congressionally created cause of action that plaintiffs may use to remedy rights secured by federal laws. Whereas in implied cause of action cases plaintiffs must demonstrate both that the relevant federal law secures rights *and* that Congress intended to create a cause of action to enforce those rights, in § 1983 cases plaintiffs need only show that the statute in question indeed secures the appropriate rights. *See also* note 4, *supra*.

12. The dissent construes § 1437p as going further than establishing the necessary procedures for the actual demolition of federally funded public housing, while the concurrence states that this section falls short of even that mark. The dissent maintains that § 1437p "imposes an affirmative duty on PHAs not to abandon public housing projects" unless the prerequisites are met and HUD has approved, diss. op. at 669, adding that "the statute creates in tenants a right to keep their public housing tenancies so long as the PHA has failed to comply with these

statutory prerequisites." *Id.* Yet, § 1437p nowhere speaks of a duty "not to abandon" or a right "to keep"; it merely lays out the procedure for "demolition," which is defined as the "destruction of structures." Webster's Third New International Dictionary 600 (1976).

The concurrence, in contrast, argues that on the one hand the statute does not *clearly require* a PHA to seek HUD approval prior to demolition, but on the other hand that "Congress *intended that* HUD would secure a promise from the PHAs not to demolish" without applying to the Secretary. Conc. op. at 664 (emphasis added). Even if it were possible to parse a difference between two such levels of congressional intent, neither the legislative history nor the logic of the statutory scheme lends any support to the concurrence's novel distinction; rather, both sources reveal that Congress clearly intended demolition to occur only after HUD approval of a PHA request.

The House and the Senate Reports refer pointedly to the restrictions that *the bill itself* placed on demolition of federally funded housing. The House Report states that "[t]he bill places certain restrictions on the demolition, sale or disposal of public housing projects...." H.R.Rep. No. 123, 98th Cong., 1st Sess. 36 (1983). The Senate Report adds that "[t]he bill ... includes reasonable and workable restrictions which nevertheless allow the demolition and/or disposition of public housing projects...." S.Rep. No. 142, 98th Cong., 1st Sess. 38 (1983), 1983 U.S.Code Cong. & Admin.News, 1809. There is not a clue that the drafters and sponsors thought that the Secretary's approval for demolition was optional with HUD. Indeed, such a provision would be nonsensical on its face. Finally, the housing amendments containing § 1437p had been enacted as part of the Supplemental Appropriations Act of 1984, so that there was no conference report and almost no floor debate on them. Representative St. Germain, Chairman of the House Committee on Banking, Finance and Urban Affairs (which had reported the initial bill), clarified the purpose of the housing amendments to his House colleagues in a floor statement. That clarification left no doubt about the need for the Secretary's approval for any demolition:

[T]he Committee does not intend to encourage the sale of public housing projects.... The demolition ... of these extremely vital housing units should only be undertaken as a last resort and only if each and every condition for such [a] transaction[ ] [has] been met.

....

... This bill is intended to set standards limiting the circumstances under which pub-

This conclusion regarding § 1437p permits us to reject plaintiffs' entire complaint. We initially dispose of two claims against the District. First, plaintiffs' claim through § 1983 to vindicate alleged § 1437p rights against constructive demolition falls directly under our main ruling. Second, plaintiffs argue, again through § 1983, that "[t]he demolition and relocation requirements located at ... § 1437p ... provide the plaintiffs with clear substantive rights, the deprivation of which require procedural Due Process protections." Pl. Br. at 38–39. Because we reject plaintiffs' contention regarding the rights that § 1437p provides, we also reject their due process claim based on those alleged rights.[13]

Next, we dispose of plaintiffs' third-party beneficiary claim against both HUD and the District under the Annual Contributions Contract (ACC). In their complaint, plaintiffs claimed that "[u]nless enjoined by this Court, all defendants will continue to breach the ACC by failing to provide standard housing to tenants living at and relocated from Fort Dupont." Pl.Comp. at 15, J.A. at 22. The ACC provisions named by the plaintiffs read as follows:

Section 201. Use of Projects

The Local Authority shall at all times operate each project (1) solely for the purpose of providing decent, safe and sanitary dwellings (including necessary appurtenances thereto) within the financial reach of Families of Low Income, (2) in such manner as to promote serviceability, efficiency, economy, and stability, and (3) in such manner as to achieve the economic and social well-being of the tenants thereof.

Section 209. Repair, Maintenance, and Replacement

The Local Authority shall at all times maintain each Project in good repair, order, and condition.

Although this cause of action might be read broadly to assert a third-party beneficiary claim to "standard housing" based on the ACC only, or perhaps also the closely related general policy section of the statute, § 1437, plaintiffs on appeal have made quite clear that their third-party beneficiary claim is more narrowly circumscribed:

Plaintiffs do not assert on appeal that they can enforce an express obligation either upon HUD or the District in federal court solely upon the policy provisions set forth in section 1437 of the Act. Rather, plaintiffs claim that as third party beneficiaries they are entitled to enforce compliance with the explicit protections afforded against unwarranted demolition and arbitrary relocation in

lic housing can be demolished or otherwise disposed. It is our intention that the standards in this bill be fully enforceable by tenants, tenants councils and through certification by local government officials.
Staff of the House Subcommittee on Housing and Community Development of the Committee on Banking, Finance and Urban Affairs, 98th Cong., 1st Sess., Compilation of the Domestic Housing and International Recovery and Financial Stability Act of 1983, at 319 (Comm. Print 1984) (reporting statement of Rep. St. Germain on House floor, November 18, 1983).

This legislative history supports the only reading of § 1437p that makes the section meaningful; under the concurrence's interpretation, § 1437p procedures would not even come into play unless HUD required PHAs to agree to follow them. But it defies rational statutory construction to contend that Congress would enact a section entitled "Demolition and disposition of public housing," provide for a particular procedure for demolition of public housing, and include no exception to that procedure, only as a discretionary option for HUD or local PHAs to follow or even only with the "expectation" that HUD would require local PHAs to follow it.

In short, we read § 1437p, titled "Demolition and disposition of public housing," as covering no more and no less than its name implies.

13. Plaintiffs' claim that the District violated the implementing regulations, 24 C.F.R. § 970 (1986), suffers the same fate. The regulations, which basically track the statutory terms, only come close to prohibiting one of the actions that the District has taken by providing that the application must include "a plan for the relocation of tenants who *would be* displaced by the proposed demolition." 24 C.F.R. § 970.8(d) (emphasis added). This requirement indicates that HUD does not expect the relocation itself to take place before demolition approval, as plaintiffs allege the District has attempted to do. However, this requirement does not rise to the level of a proscription of such preapproval relocation; moreover, as with the statute, the regulations are conditions precedent to demolition approval (and, therefore, actual demolition), not independent duties.

§ 1437p of the Act and applicable HUD regulations, 24 C.F.R. § 970 *et seq.* Pl. Br. at 48. Because plaintiffs' third-party beneficiary claim hinges on our conclusion regarding the alleged "protections" afforded by § 1437p, our rejection of § 1437p rights based on a theory of constructive demolition necessitates our rejection of the third-party beneficiary claim as well.[14]

■ Only plaintiffs' cause of action against HUD under the APA for failing to deny the District's demolition application remains. In their complaint, plaintiffs claimed that HUD has acted "arbitrarily, capriciously, abused their discretion, or otherwise acted contrary to law by failing to deny [the District's] present application." Pl. Comp. at 18, J.A. at 25. Before us, plaintiffs argue that "HUD has both failed to prevent the District from engaging in *de facto* demolition at the project, and has

**14.** Since plaintiffs' third-party beneficiary argument plainly relies upon their § 1437p rights claims, we need not address, as the District Court did, 628 F.Supp. at 343–45, whether plaintiffs could receive more general relief, such as obtaining "standard housing," as third-party beneficiaries of the ACC. *See Samuels v. District of Columbia,* 770 F.2d 184, 201 n. 14 (D.C. Cir.1985) (suggesting, but not holding, that such relief should not be available in the absence of clear congressional intent to the contrary).

**15.** Plaintiffs cite letters from HUD to the Augusta, Georgia Housing Authority regarding the proposed sale of a public housing project. Pl. Br. at 26, Pl. Br. Add. at 22–23. These letters warned the authority not to encourage tenants to vacate their dwellings and not to fail deliberately to fill vacancies. Plaintiffs want HUD to instruct the District similarly. While we agree that HUD might do well to tell the District that its behavior is not bringing it any closer to gaining approval of its demolition request, we also agree with HUD that *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), applies here and forecloses review under the APA. In *Chaney,* the Court held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)," 105 S.Ct. at 1656, which forecloses APA review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Although "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," 105 S.Ct. at 1656, it is clear that § 1437p does not address how, or even if, HUD must super-

unreasonably delayed agency action." Pl. Br. at 39. This argument appears to go beyond the complaint, but in any case we may dismiss it quickly. Regarding the District's failure to prevent constructive demolition,[15] our rejection of the plaintiffs' principal constructive demolition theory mandates a rejection of any duty HUD might have to prevent such behavior. As to the plaintiffs' argument regarding delay, we echo the District Court's response: "The Court finds plaintiffs' position puzzling. If the applications are incomplete as plaintiffs allege, then HUD is precluded from taking any action on them." 628 F.Supp. at 339 n. 5.

### III. CONCLUSION

What the District of Columbia is doing to the public housing tenants in the Fort Dupont project is difficult to ascertain.[16]

vise the local PHAs with regard to pending demolition applications. As we have stated in the text, § 1437p's only requirement with regard to HUD is that it not approve a demolition application without certain conditions precedent being satisfied. HUD has appropriately failed to approve the District's application here, and we can demand no more of it under § 1437p.

**16.** It is possible that there is neither rhyme nor reason behind the District's behavior, but merely neglect. A recent report issued by the District's auditor reveals that many public housing units in the District are left vacant for months, and that many needed repairs are left undone. Office of the District of Columbia Auditor, Review of Department of Housing and Community Development's Property Management Administration's System of Maintenance, Practices, and Financial Controls: FY 1983–FY 1985 (Nov. 26, 1986). Both types of inaction lead to vandalism, the report notes, exacerbating the problem. Except for the allegation that the District's attempts to relocate the Fort Dupont tenants failed to meet § 1437p(b)(2)'s requirements regarding displacement, plaintiffs' complaint mostly alleges various types of inaction, such as failure to consult with the tenants, failure to keep the vacant units in a state of good repair, and failure to rerent vacant units. These problems, as the auditor's report makes plain, may well exist on a city-wide basis and without regard to whether a demolition application is pending. In this case the existence of a pending demolition application cannot convert an apparently endemic state of District neglect into the deprivation of federal rights under § 1437p.

Plaintiffs might find recourse in local law from the District's alleged neglect and violation of its contractual obligations; however, because § 1437p does not secure rights to stop a PHA from *seeking* demolition approval without consulting with tenants or providing for their appropriate relocation, plaintiffs' claims in this case must fall.

17. Though we agree with the District Court's ultimate conclusion, we find parts of its reasoning somewhat obscure, and, in the interest of clarifying future law in the circuit, point out here our areas of agreement and disagreement with its rationale. The court began by construing plaintiffs' "Count IV" claim against HUD under the APA as a claim that "the demolition applications ... fail to satisfy the statutory and regulatory prerequisites for demolition." 628 F.Supp. at 338. Actually, plaintiffs' claim in the first part of Count IV, which they had dropped, *see* note 2, *supra,* was that HUD improperly denied modernization funds "without assisting [the District] to comply with the statutory and regulatory prerequisites for granting the application." Pl. Comp. at 18, J.A. at 25. The court then went on to the second part of Count IV, where plaintiffs argued that HUD violated the APA by "failing to deny [the District's] present application to demolish 112 units at Fort Dupont," Pl. Comp. at 18, J.A. at 25, and dismissed the entire count as not ripe because the prerequisites for approval of a demolition application had not been satisfied. 628 F.Supp. at 338. This resolution was incorrect, since plaintiffs' contention was that HUD's current failure to deny the application, albeit incomplete, nevertheless constitutes illegal action. The court apparently recognized this, for in a footnote it responded to what it termed an alternative argument, that HUD had unlawfully delayed agency action. 628 F.Supp. at 339 n. 5. The court's response to *this* version, on the merits, makes sense; and in the text following note 14, we agree with it.

Next, the court held that plaintiffs' supposed source of jurisdiction, 28 U.S.C. § 1337 (commerce clause jurisdiction), "does not have its own jurisdiction conferring provision," 628 F.Supp. at 339, misinterpreting, we fear, the Second Circuit's opinion in *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (1975), which merely held that "[w]hile ... § 1337 ... is important when the Act of Congress does not have its own jurisdiction conferring provision ..., it adds nothing to one that does." The District Court reasoned that "[f]or federal jurisdiction to exist pursuant to [§ 1337], some federal right ... must be present," 628 F.Supp. at 339, citing *Perry v. Housing Auth.,* 486 F.Supp. 498, 500–01 (D.S.C. 1980), *aff'd,* 664 F.2d 1210 (4th Cir.1981). *Perry* actually held only that "[t]he federal district courts have jurisdiction pursuant to § 1337 over

Accordingly, the judgment of the District Court dismissing plaintiffs' complaint in its entirety is hereby

*Affirmed.*[17]

**WILLIAMS, Circuit Judge, concurring:**

I concur in Chief Judge Wald's opinion only to the extent that its analysis is necessary to its holding. I write separately to claims arising from acts of Congress regulating commerce," and that an act regulates commerce "when its constitutional basis is the Commerce Clause...." 486 F.Supp. at 500.

The District Court, then finding it necessary to locate a federal right to support § 1337 jurisdiction, went on to reject a private right of action under § 1437, 628 F.Supp. at 339–40, which plaintiffs had denied they were asserting. *See, e.g.,* Rec. No. 33 at 2–3.

Turning to the § 1983 claims, the court rejected yet another claim plaintiffs never raised, that of a § 1437 right to decent, safe, and sanitary housing. 628 F.Supp. at 341. It also rejected plaintiffs' claim that § 1437d(*l*) creates a right to the enforcement of terms contained within leases, a ruling with which we agree in note 2, *supra.* 628 F.Supp. at 341–42. The court also rejected the nonexistent claim that the Constitution guarantees housing of a particular quality. 628 F.Supp. at 342.

The court then properly addressed plaintiffs' constructive demolition argument, holding that § 1437p(b)(2) "is only relevant once a demolition application has been approved and plaintiffs are displaced pursuant to the approved demolition." 628 F.Supp. at 342. As discussed in part II.B., we essentially agree with this. We also agree, in the text at note 13, with the court's conclusion that the plaintiffs have not been deprived of procedural due process. 628 F.Supp. at 343. Having found no rights upon which it could support § 1337 jurisdiction, the court, however, returned to its erroneous view of commerce clause jurisdiction by holding that it does not exist in this case. 628 F.Supp. at 343.

Finally, the court "decline[d] to exercise pendent jurisdiction over plaintiffs' local law claims," 628 F.Supp. at 345, which can only be the ones under the Annual Contributions Contract that the court had already resolved against the plaintiffs on the merits. The court's ultimate conclusion that it would "dismiss the entire action on the grounds [sic] that subject matter jurisdiction is lacking," 628 F.Supp. at 345, is also mistaken. Plaintiffs' § 1983, APA, and constitutional claims quite clearly arise under the Constitution and federal laws, as required by 28 U.S.C. § 1331, cited by plaintiffs as a source of jurisdiction along with § 1337. Thus, the court clearly had jurisdiction over the subject matter of the action, even though no valid cause of action was ultimately found.

distinguish its holding from dicta, in which I do not join.

As Chief Judge Wald correctly observes, the Supreme Court has held categorically that "if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*.... By insisting that Congress speak with a *clear* voice, we enable the States to exercise their choice knowingly...." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (emphasis added). Thus we have before us the rather straightforward task of determining whether Congress, in 42 U.S.C. § 1437p (Supp. III 1985), has "unambiguously" and "clear[ly]" imposed on local housing authorities a duty not to abandon the premises while demolition applications are pending before HUD.

The clear language of § 1437p, we hold, does no more than "create[ ] conditions precedent that must occur before the Secretary approves a demolition application.... [T]hese conditions precedent do not, by themselves, constitute independent duties." *Ante* at 659 (footnote omitted). Thus, § 1437p does not "create[ ] rights in public housing tenants against the constructive demolition of their units." *Ante* at 659 (footnote omitted).

Since there is no language in § 1437p addressing the question of constructive demolition at all, I think it unnecessary to embark on a broad survey of the quality of language that would be necessary to create such a right. *See ante* part II.A. Nor do I find it necessary to sift through § 1437p's legislative history for some hint of unexpressed congressional intent to create such a right. *See ante* at 659 – 660. No amount of legislative history could convert nonexistent language into a "clear" and "unambiguous[ ]" expression of congressional intent.

Nor can I agree with my colleagues' assertions that § 1437p creates a right that tenants can enforce against *actual* demolition. *Ante* at 658 n. 7, 659 – 660, 660 n. 12; *post* at 668 – 669. The point is, of course, quite unnecessary to our holding, in light of our conclusion that § 1437p creates no clear PHA duty not to abandon. It is, however, essential to Judge Will's conclusion, and it is appropriate in these circumstances to suggest how the statute can make sense in the absence of such a reading.

We may safely assume that Congress would not have required HUD to impose conditions on consent to demolition if it expected PHAs to be free to demolish without consent at all. Yet, equally clearly, the language of § 1437p imposes no clear obligation on PHAs to secure HUD consent to demolition. The most likely explanation for the absence of such a clear statutory obligation is that Congress intended that HUD would secure a promise from the PHAs not to demolish, or would by regulation prohibit them from doing so, without HUD approval.[1] HUD has done exactly that. A clause of the Annual Contributions Contract ("ACC"), which all PHAs sign as a prerequisite to receipt of their subsidies, requires PHAs to abide by all regulations issued by HUD pursuant to the United States Housing Act of 1937. *See* Addendum for Federal Appellees at 36, 39, 40 (ACC part 1, § 5 requires PHA to "operate all Projects covered by this Contract in compliance with all provisions of ... the Act [and] all regulations issued by the Government pursuant thereto"). The regulations in turn prohibit demolition without submission and approval by HUD of an application. *See* 24 C.F.R. § 970.8 (1986) ("[w]ritten approval by HUD shall be required before the PHA may undertake any transaction involving demolition").[2]

---

1. "The most likely explanation" that I suggest in the text is speculation as to what Congress *might have* intended, not (as Chief Judge Wald's truncated quotation of that sentence would suggest, *ante* at 660 n. 12) a finding of congressional intent. No one can make such a finding with confidence in this case precisely because Congress has not made its intent *clear*.

2. Elsewhere in the legislation that enacted § 1437p Congress required the Secretary to impose conditions on granting of consent without, so far as appears, requiring consent. Under 12 U.S.C. § 1715z–15(a) (Supp. III 1985) (added by Pub.L. No. 98–181, § 433, 97 Stat. 1221 (1983)), "the Secretary shall not accept an offer to prepay [a] mortgage" without first making specific

Thus there is no reason to fear that my reading of the clear language "would create a loophole in the statutory scheme that would effectively repeal it," *post* at 668, much less that it would leave a PHA free "to do whatever it pleased," *id.* Any actual demolition by a PHA would put it in violation of HUD regulations and in breach of the ACC and subject it to enforcement action and contract remedies at HUD's behest. But HUD's sensible implementation of the congressional will, in this contractual and regulatory form, is quite different from Congress's clearly creating a tenant right enforceable under § 1983.

The statutory scheme is quite coherent without our transforming a condition precedent to HUD action (approval) into a condition precedent to PHA action (demolition), *compare ante* at 659 – 660, or a PHA obligation to HUD into a PHA obligation to tenants. Blurring these distinctions violates our duty under *Pennhurst* to find § 1983 obligations only where "Congress speak[s] with a clear voice," 451 U.S. at 17, 101 S.Ct. at 1540.

To be sure, there are cases in which an agency regulation can define the exact scope of a duty that Congress has clearly created. *See School Board v. Arline,* — U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Wright v. City of Roanoke Redevelopment & Housing Authority,* — U.S. ——, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). But where Congress has not clearly created any duty, there is no § 1983 right for regulations to define.[3]

Accordingly, I do not join in part II.A of Chief Judge Wald's opinion, or in any implication in part II.B that legislative history could resolve the inquiry before us or that a PHA's actual demolition would be actionable by tenants.

WILL, Senior District Judge, dissenting:

The plaintiffs are residents of the Fort Dupont Housing Project in southeast Washington, D.C. Their complaint, the allegations of which, as the majority acknowledges, we must accept as true, states that the District of Columbia's local public housing authority (PHA) has deliberately engaged in a systematic practice of vacating units and refusing to maintain Fort Dupont so as to create a *fait accompli* and thereafter to obtain HUD's approval to demolish an abandoned and uninhabitable project. The complaint further alleges that HUD has failed to hold the District to the statutory prerequisites for demolishing public housing property. The only question presented is whether these allegations state a cause of action against the District under 42 U.S.C. § 1983 for violating the Housing Act of 1937, 42 U.S.C. § 1437p, and against HUD under the Administrative Procedure Act, 5 U.S.C. § 706, for unlawfully withholding agency action.

The majority holds that the district court properly dismissed the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Because I believe the Housing Act clearly requires a local housing authority to obtain HUD approval before it may constructively demolish a public housing project by evacuating the tenants and abandoning the project, I dissent.

I.

Section 1437p of the Housing Act provides that the Secretary "may not approve" a PHA's application for demolition of a public housing project or portion thereof unless the Secretary has determined that the project or the portion "is obsolete as to physical condition, location, or other factors, making it unusable for housing purposes, or no reasonable program of modifications is feasible to return the project or portion ... to useful life." 42 U.S.C. § 1437p(a)(1). The Act further provides that the Secretary "may not approve"

---

determinations. But these conditions are triggered only with respect to "any period in which an owner of a multifamily rental housing project is required to obtain the approval of the Secretary for prepayment of the mortgage." *Id.* The statute defines no such period.

**3.** Here, of course, even if § 1437p imposed any clear duty on PHAs, the regulations would be of no assistance to plaintiffs, for they do not encompass abandonment.

a demolition application unless the PHA has developed the application "in consultation with tenants and tenant councils, if any, who will be affected by the demolition," 42 U.S.C. § 1437p(b)(1), and will give assistance to "all tenants to be displaced as a result of the demolition or disposition." Such assistance is to include seeing that displaced tenants are "relocated to other decent, safe, sanitary, and affordable housing, which is, to the maximum extent practicable, housing of their choice." 42 U.S.C. § 1437p(b)(2).

All three members of this panel agree that § 1437p establishes preconditions to HUD approval of a PHA's demolition application. I further agree with Chief Judge Wald that § 1437p provides a private cause of action against PHAs that engage in actual demolition without obtaining prior HUD approval. I would go one step further, however, and hold that § 1437p, if it is to be meaningful and effective, also prohibits a PHA, acting without prior HUD authorization, from condemning a project to death as effectively as if it were physically demolished by abandoning and neglecting it.

It is undisputed that the District PHA's actions in vacating more and more units and refusing to maintain the remainder is resulting in the slow death of the Fort Dupont project without HUD approval. Chief Judge Wald concludes that nothing can be done about it until physical demolition actually commences. Judge Williams apparently believes that even then no one but HUD could do anything about it. I, on the other hand, believe § 1437p creates rights enforceable through 42 U.S.C. § 1983, and that the scope of the rights

created necessarily extends to *de facto* demolitions. If it does not, the statutory scheme established by Congress requiring prior HUD approval and setting conditions for such approval can easily be avoided and is meaningless.

The plaintiffs' allegations include the following: In 1977, HUD approved nearly half a million dollars in modernization funds for 28 units at Fort Dupont. The District PHA, rather than using these funds to rehabilitate the 28 units, waited four years and then applied for HUD approval to demolish them. By 1983, the District had revised its application to request demolition of 112 units. No one disputes that in filing these applications the District and its PHA did not comply with the statutory prerequisites of tenant consultation and relocation.[1] HUD informally so advised them although it has not in the intervening five years formally rejected the applications. The applications are theoretically still pending although all involved recognize that they are defective.

By January 1984, the District had vacated 74 of the 112 units for which it was nominally seeking HUD demolition approval. A year later the District, through its PHA, began to relocate the remaining 38 families. Families that refused to move were threatened with eviction. Some received notices to quit. On May 30, 1985, District officials told 47 more Fort Dupont families to leave their homes. This brought the vacancy rate at Fort Dupont's 300 units to 159, over fifty percent.

The record shows that the District's failure to rent and maintain the vacant units has led to increased vandalism and a gener-

---

**1.** The plaintiffs also produced evidence indicating that the District could not comply with the Act's obsolescence requirement. Donald F. Humphrey, former Director of the District of Columbia Housing Development Corporation, testified:

> Based upon this consultant's initial observation, Fort Dupont Dwellings including the 112 units do not appear obsolete as to physical condition, location, or other factors, making them unusable for housing purposes....
> The damage done to these structures has been caused by owner, not resident, neglect. Because of the quality of the original con-

struction used at Fort Dupont, it would be unreasonable to demolish the units. Had even reasonable protection been afforded the dwellings, as required by law, major structural damage probably would not have occurred. However, based upon my initial observations, even given the lack of maintenance, Fort Dupont including the 112 units which [the local PHA] has asked to demolish can be rehabilitated at much less cost than that of building comparable replacement housing.

Affidavit of Donald F. Humphrey, Exhibit VII to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss.

al deterioration of all the properties. One expert observer commented that "conditions of the abandoned buildings are so deplorable that it is hard to imagine that a private owner could escape fines or imprisonment for the unrectified violations that exist." Affidavit of Donald F. Humphrey, *supra* n. 1.

The plaintiffs allege more, however, than an unwise District policy disadvantaging them. They contend that the District has pursued a deliberate policy of evacuation and neglect that will lead inevitably to the obsolescence, abandonment and physical demolition of Fort Dupont. *Cf. Cole v. Lynn,* 389 F.Supp. 99, 105 (D.D.C.1975) (in action challenging HUD demolition approval, agency required to keep project in good repair *pendente lite* to prevent vacancies and vandalism from "effectively accomplish[ing] demolition by a process of erosion"), *aff'd,* 571 F.2d 590 (D.C.Cir.1977), *rev'd on other grounds,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979). In the plaintiffs' view, the failure to maintain and the evacuation of Fort Dupont tenants reflect a systematic policy designed to render this federally funded housing project "unusable for housing purposes." 42 U.S.C. § 1437p(a)(1). The purpose of the District's policy, the plaintiffs allege, is to clear the way for the ultimate actual demolition of an abandoned Fort Dupont.

From our review of the plaintiffs' allegations—which I again point out we are constrained to accept as true in reviewing a dismissal for failure to state a claim—it should be clear that this is not a run-of-the-mill landlord-tenant dispute. As I believe the following sections demonstrate, this case involves a deprivation of rights secured by federal law and has implications going to the heart of the Housing Act and the public housing program across the nation.

## II.

To determine whether § 1437p creates rights enforceable through a lawsuit under § 1983, we need look no further than the Supreme Court's recent decision in *Wright v. City of Roanoke,* — U.S. —, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). In *Wright,* the Court considered whether a separate provision of the same Housing Act could be enforced through § 1983. Section 1437a of the Act provides that a low-income family "shall pay as rent" a specified portion of its income. HUD had consistently considered "rent" to include a reasonable utilities allowance. When the City of Roanoke's PHA imposed a utilities charge that was not reduced according to the statutory formula, the tenants sued under § 1983.

The Supreme Court began its analysis by reciting the general rule of *Maine v. Thibotout,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), that § 1983 is available to remedy violations of federal statutes. It then reviewed the two exceptions to *Thibotout:* (1) "where Congress has foreclosed [§ 1983] enforcement of the statute in the enactment itself," 107 S.Ct. at 770 (citing *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)); and (2) "where the statute did not create enforceable rights, privileges or immunities within the meaning of § 1983." *Id.* (citing *Pennhurst State School and Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2 694 (1981)). The Court held that neither of these exceptions was applicable to § 1437a. While the statutes at issue in *Sea Clammers* and *Smith v. Robinson* provided specifically for private judicial remedies, indicating a congressional intent to displace the § 1983 remedy, the Court found "nothing of that kind [in § 1437a] *or elsewhere in the Housing Act.*" 107 S.Ct. at 773 (emphasis added). On the question of enforceability, the Court noted that § 1437a spoke in mandatory language and that any vagueness in its terms was cured by the implementing regulations. "In our view," the Court concluded, "the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not, as respondents

suggest, beyond the competence of the judiciary to enforce." *Id.* at 775.[2]

*Wright* removes any doubt that the Housing Act itself does not foreclose resort to § 1983, a point on which Chief Judge Wald agrees. *Ante,* at 654 n. 3. More important, *Wright* rejects the method of statutory interpretation employed by today's majority in determining whether § 1437p creates enforceable rights.

The majority puts heavy reliance on dicta in *Pennhurst* declaring that states participating in federal grant-in-aid programs must be given adequate notice of the obligations they assume by signing up. Finding that § 1437p establishes "conditions precedent" rather than "independent duties," *ante,* at 659, the majority concludes that the statute is insufficiently specific to put states on notice of any obligations they may owe to public housing tenants. Significantly, *Wright* contains no mention of this supposed notice requirement. The reason is that there is no such requirement when the statute at issue uses mandatory, rather than merely precatory, language. *See School Bd. of Nassau Cty. v. Arline,* — U.S. —, 107 S.Ct. 1123, 1130 n. 15, 94 L.Ed.2d 307 (1987) (distinguishing *Pennhurst* on similar grounds). Unlike the statute in *Pennhurst* which stated mere congressional "findings," the statute in *Wright* sets forth specific obligations. In such circumstances, there is no risk that a state could be lulled into believing that it is getting something for nothing. *Cf. Pennhurst,* 451 U.S. at 25, 101 S.Ct. at 1544.

Like the *Wright* statute and unlike the *Pennhurst* statute, § 1437p speaks in mandatory terms. Its directive cannot be interpreted as being merely advisory or precatory. As in *Wright,* "[t]he intent to benefit tenants is undeniable." 107 S.Ct. at 774. By virtue of the statute and the applicable regulations, the District and its PHA were on notice that their acceptance of federal funds would limit their authority to aban-

don Fort Dupont and cause its destruction without prior HUD approval. Nothing in the statute, the legislative history or the applicable regulations would warrant a PHA in believing it could take all the steps in a demolition plan such as withholding maintenance, evicting all the tenants, permitting the units to become uninhabitable, and allowing vandalism, without HUD approval, so long as no physical demolition took place.

Rather than searching for indicia of "notice," the *Wright* Court asked whether § 1437a conferred benefits that were "beyond the competence of the judiciary to enforce." 107 S.Ct. at 775. To determine enforceability, the Court examined the implications of the statutory language and HUD's implementing regulations. The Court concluded that the benefits conferred by § 1437a as supplemented by the regulations were "sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983." *Id.*

The *Wright* Court's analysis is fully applicable to this case. Section 1437p speaks in terms of restricting the Secretary's discretion, but it obviously does more than that. At a minimum § 1437p also requires PHAs to comply with the obsolescence, tenant consultation, and relocation provisions of the Act before engaging in demolition. Any other interpretation would mean that as long as a PHA did not make the mistake of asking HUD for its approval in advance, it could do whatever it pleased, including displacing tenants pursuant to a demolition plan without providing for appropriate relocation. That would be an outlandish interpretation of the Act. It would create a loophole in the statutory scheme that would effectively repeal it.

While the statute itself plainly contemplates that PHAs will obtain prior HUD approval, the implementing regulations make the requirement explicit. In particu-

---

**2.** The Court further observed:

 Lastly, it is said that tenants may sue on their lease in state courts and enforce their [§ 1437a] rights in that litigation. Perhaps they could, but the state-court remedy is hardly a reason to bar an action under § 1983,

which was adopted to provide a federal remedy for the enforcement of federal rights.
107 S.Ct. at 774. This passage refutes the majority's rather perfunctory dismissal of the plaintiffs' lease-based claim under 42 U.S.C. § 1437d(*l*), *ante,* at 653 n. 2.

lar, 24 C.F.R. § 970.8, provides that "Written approval by HUD shall be required before the PHA may undertake any transaction involving demolition or disposition." Another section, 24 C.F.R. § 970.5(a), states that "Tenants who are to be displaced as a result of demolition ... shall be replaced to other decent, safe, sanitary and affordable housing." To dismiss these provisions as "basically track[ing] the statutory terms," as does the majority, *ante,* at 661 n. 13, is to concede that the statute does what the regulation does; that is, it imposes an affirmative duty on PHAs not to abandon public housing projects unless (1) they are obsolete, (2) the PHA has consulted with tenants, (3) the PHA has made appropriate arrangements for tenants' relocation, and (4) HUD has given its approval. Correspondingly, the statute creates in tenants a right to keep their public housing tenancies so long as the PHA has failed to comply with these statutory prerequisites. Since that right is specific, definite, and unambiguous, it is fully amenable to judicial enforcement. *Wright,* 107 S.Ct. at 775.

Judge Williams is not bothered by an interpretation of the Act that would impose conditions on HUD's demolition approval authority while permitting PHAs to avoid the conditions by not asking for HUD approval. According to Judge Williams, Congress must have "intended that HUD would secure a promise from the PHAs not to demolish" without prior HUD approval. *Ante,* at 664 (Williams, J., concurring). With all due respect, this bit of congressional mind-reading is not supported by anything in the statute, the legislative history, or the regulations. Nor does HUD's standard form Annual Contributions Contract ("ACC"), used in thousands of HUD agreements with PHAs, contain such a provision. The ACC provision Judge Williams relies on—requiring PHAs to abide by all HUD regulations—adds nothing to his analysis, since the regulations are every bit as effective with or without the contractual provision.

Moreover, Judge Williams' conclusion does not follow from his premises. If it was indeed the "congressional will" that PHAs obtain HUD approval before engaging in demolitions, *ante,* at 665 (Williams, J., concurring), then it simply does not matter whether the regulations, rather than the statute itself, are the immediate source of the obligation. *Wright* teaches that regulations promulgated under the Act may provide the requisite specificity for enforcement under § 1983.

After *Wright,* there can no longer be any question that the Housing Act, including § 1437p, secures federal rights. Since the exceptions of neither *Pennhurst* nor *Sea Clammers* apply, the general rule of *Thibotout* is controlling and § 1437p is actionable through § 1983.

### III.

If § 1437p creates an enforceable federal right, we must next consider whether *de facto* demolitions fall within the scope of the right created. *"De facto* demolition," as the plaintiffs use it, is simply a shorthand form denoting the deliberate abandonment of public housing units to render them uninhabitable and therefore subject to demolition. The phrase itself should not scare us off.

Chief Judge Wald, conceding that an *actual* demolition would be actionable, draws the line at the moment when the wrecking ball begins to swing. *Ante,* at 658 n. 7, 659 – 660 & n. 12. I find nothing in the congressional plan to support a distinction between actual and *de facto* demolitions. On the contrary, I find an unequivocal congressional preference for preserving and maintaining existing housing units whenever and wherever possible. *See, e.g.,* S.Rep. No. 142, 98th Cong., 1st Sess. 38, *reprinted in* 1983 U.S.Code Cong. & Ad.News 1768, 1809 ("As long as a shortage of low rent housing persists, the Committee believes that every effort should be made to retain the present stock of public housing."); Subcommittee on Housing and Community Development of the Committee on Banking, Finance and Urban Affairs, 98th Cong., 2d Sess., Compilation of the Domestic Housing and International Recovery and Financial Stability Act of 1983, at 319 (Comm. Print 1984) ("The demolition or disposition of

these extremely vital housing units should only be undertaken as a last resort and only if each and every condition for such transactions have been met.").

Particularly worth noting is the following passage from the House Report on the bill that became § 1437p:

> In deciding whether a project is substantially unoccupied, the Secretary should make a determination that the PHA has not engaged in a policy or practice of vacating the units or project to meet this requirement, to avoid paying relocation benefits or to avoid involving tenants in the disposition plan.

H.R.Rep. No. 123, 98th Cong., 1st Sess., at 37 (1983). Though Chief Judge Wald correctly points out that the "substantially unoccupied" requirement did not make it into the final version of the bill, *ante* at 659 n. 10, this observation does not undermine the above passage's continuing authority as a statement of congressional intent. The Senate version made the demolition requirements more demanding, not less. While deleting the "substantially unoccupied" language of the House bill, the Senate version added provisions that are considerably more protective of tenants' rights. Ordinarily, projects which are "unusable for housing purposes," S. 1338, 98th Cong., 1st Sess. § 307 (1983) (enacted as 42 U.S.C. § 1437p)—as well as "obsolete as to physical conditions, location or other factors" such that "no program of modification is feasible to return [them] to useful life," *id.*—are "substantially unoccupied" as well. The Senate modifications in the House bill in no way denigrate Congress' concern with PHAs deliberately manipulating or ignoring the Act's demolition approval requirements. They certainly should not be read as authorizing PHAs to avoid the statutory obligation to secure HUD approval before destroying a housing project.

The reasonable implications of the Act itself are equally compelling. When Congress prohibits a result—such as the destruction of a housing project without prior approval—we should not assume that it would distinguish between different methods by which the same prohibited result is achieved. It seems clear to me that it would not. Whether a housing project is demolished swiftly by bulldozers or slowly by abandonment and neglect, the result is the same. In each instance, the available supply of low-income housing is diminished and the plight of our nation's homeless and impoverished citizens is made more dismal. Actual demolitions at least have the virtue of being efficient. *De facto* demolitions have nothing to recommend them—nothing that is, except for those whom the law evasion advantages. Because I find no indication that Congress would distinguish between actual and *de facto* demolitions, prohibiting one and permitting the other without HUD approval even though both achieve the same result, I conclude that § 1437p requires a PHA to obtain HUD approval before it may engage in a concerted course of conduct designed to destroy public housing units whether by actual demolition or by rendering them uninhabitable.

IV.

The district court's dismissal of the HUD defendants for failure to state a claim was also erroneous in my estimation. The gist of the plaintiffs' claim against the HUD defendants is that they have "failed to prevent the District from engaging in *de facto* demolition at the project." If the plaintiffs can prove that Fort Dupont is being evacuated and abandoned for the purpose of finally demolishing the project, as they may be able to do, I believe they may also have a claim under the Administrative Procedure Act against HUD for declining to prevent the *de facto* demolition.

Section 706(1) of the APA directs a reviewing court to "compel agency action unlawfully withheld." Though HUD of course has a broad measure of enforcement authority, this authority has its limits. *See, e.g., NAACP v. Secretary of Housing and Urban Development*, 817 F.2d 149 (1st Cir.1987) (Secretary's failure to administer Fair Housing Act in accordance with its basic policies held subject to judicial review under APA). For HUD to base its decision not to act on impermissi-

ble considerations, for example, would be an abuse of discretion. On the present record, we cannot say whether HUD's reasons for standing idle for five years were legally permissible. Given the seriousness of the plaintiffs' allegations against the District, however, I doubt that HUD could justify its inaction in the face of full knowledge that a *de facto* demolition was taking place without its approval. I therefore conclude that the dismissal of the HUD defendants was premature.

### V.

Finding a cause of action for *de facto* demolitions would not open the door of the federal courts to all varieties of public housing disputes, as the majority seems to fear. On the contrary, I am concerned that the majority's holding will open the door to PHAs across the country embarking on similar programs to eliminate public housing projects by failing to maintain them, evacuating or evicting the tenants, permitting units to be vandalized and, after the projects are clearly uninhabitable, applying to HUD for formal permission to knock them down. Under Judge Williams' approach the results would be even worse: PHAs could actually demolish housing projects and no private person, only HUD, could prevent them. I find nothing in the Housing Act, its legislative history, the applicable regulations, or the decided cases which warrants much less compels such a tragic conclusion. If Congress wants to repeal the Housing Act, it can do so. Until it does, I believe judges and the courts have a duty to uphold it and not permit it to be scuttled by maneuvers such as those allegedly taking place here.

So far as this case is concerned, the plaintiffs, if permitted to proceed in district court, would face a difficult evidentiary burden. It is not easy to prove that a local government has engaged in a deliberate scheme to evade federal law. Nor is it easily proven that a federal agency abused its discretion. Even on the incomplete record before us, however, it is clear that the plaintiffs' evidence far exceeds the minimum necessary for surviving a motion to

dismiss. More important, the question before us is not whether the plaintiffs *can* prove their case; it is whether they should have an opportunity to do so. I would reverse and remand to give them that opportunity.

I would not hold, as the majority in effect does, that PHAs can embark on programs to get rid of public housing projects by a course of conduct similar to that of the District PHA here and if HUD, as here does nothing about it, no one else can until, if at all, their demolition is under way. This draconian result is inconsistent with the clear intent of Congress in enacting the Housing Act and establishing a public housing program.