Geraldine PERRY, Anna Gibbs, Sarah Mack, and Vera Deli Guest, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

The HOUSING AUTHORITY OF the CITY OF CHARLESTON, a corporate body politic, W. F. Stack, Individually and in his official capacity as Executive Director of the Housing Authority of the City of Charleston; and Jack C. Muller, Wilmot J. Fraser, Viola M. Smalls, Max Kirshstein, Raymond P. McClain, James J. French and Larry James, Individually and in their official capacity as members of the Housing Authority of the City of Charleston, Defendants.

Civ. A. No. 78–1646.

United States District Court,
D. South Carolina,
Charleston Division.

Feb. 18, 1980.

Josef Kirk Myers, Charleston, S. C., for plaintiffs.

Robert N. Rosen, J. C. Hare, Stephen T. Schachte, William B. Regan, Charleston, S. C., for defendants.

## ORDER ON MOTION TO DISMISS

HEMPHILL, Chief Judge.

Before the court is defendants' Rule 12 motions to dismiss for lack of jurisdiction and failure to state a claim for which relief can be granted. Plaintiffs in the lawsuit are tenants of a Charleston public housing project, who seek injunctive and legal relief from indecent housing. The question at issue is whether they may sue in federal court.

Plaintiff, and her alleged class, are tenants of the George Legare Homes, a public housing project operated by the Housing Authority of the City of Charleston, South Carolina (HACC). The 600 unit project, located in North Charleston, was built in 1942 by the HACC.

Under the United States Housing Act of 1937, 42 U.S.C. § 1437, *et seq.*, HACC has obtained funds from the Secretary of Housing and Urban Development through an Annual Contributions Contract ("Contract") which provides monetary assistance to local housing authorities for payment of the debt service and some operating expenses.[1]

---

1. See 42 U.S.C. § 1437c and § 1437d.

The complaint alleges,[2] that Section 201 of the "Contract" entered into by each authority reads:

The Local Authority shall at all times operate each Project (1) solely for the purpose of providing decent, safe and sanitary dwelling (including necessary appurtenances thereto) within the financial reach of Families of Low Income, (2) in such manner as to promote serviceability, efficiency, economy, and stability, and (3) in such manner as to achieve the economic and social well-being of the tenants thereof.

In Section 209, part 2, the "Contract" requires the local housing authority to maintain each project in good repair, order and condition.

Living conditions at the George Legare Homes are alleged to be so deplorable that a listing of the complaints is appropriate. Reportedly, families of present tenants have been treated for lead poisoning from the lead paint on the walls. Poor refuse service has caused serious health problems and is responsible for the large number of rats and other vermin that infest the project. Poor grading has resulted in severe erosion, and there is a lack of sidewalks and paved roads. Planted areas have deteriorated because of poor grading. The roofing, now nearly 40 years old, has not had major repair since it was constructed. Water from leaking commodes has damaged the flooring. The crime rate is high, due in part to inadequate security patrols and lighting. A dangerous electrical distribution system threatens tenant safety, while the apartment's supply of hot water and heating are inadequate.

Plaintiffs seek declaratory relief and injunction requiring defendants to restore to, and maintain the George Legare Homes in a decent condition; damages, including 35% of the total rents paid; plus attorneys' fees and costs.

2. For purposes of these Rule 12 motions, the allegations of the complaint will be accepted as true.

3. 28 U.S.C. § 1337 reads in pertinent part:

Defendants have moved to dismiss the action for lack of subject matter jurisdiction which is asserted to rest upon 28 U.S.C. §§ 1337, 2201, 2202, 1343(3) and 1331. Since the civil rights issue under 28 U.S.C. § 1343(3) and the question of declaratory judgment jurisdiction under 28 U.S.C. §§ 2201 and 2202, turn upon the findings as to commerce jurisdiction. 28 U.S.C. § 1337 and federal question jurisdiction, 28 U.S.C. § 1331, the latter allegation will be treated first.

I.

The federal district courts have jurisdiction pursuant to § 1337 [3] over claims arising from acts of Congress regulating commerce. In recent years the courts have held that an Act of Congress "regulates commerce" when its constitutional basis is the Commerce Clause of the United States Constitution. *Winningham v. United States Dept. of Hous. & Urb. Dev.*, 512 F.2d 617, 621 (5th Cir. 1975); *Murphy v. Colonial Federal Savings & Loan Ass'n*, 388 F.2d 609, 614 (2d Cir. 1967); *Imm v. Union R.R.*, 289 F.2d 858, 860 (3rd Cir.), *cert. denied*, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961). Moreover, it suffices that the Commerce Clause is a "significant" source of the Federal power rather than the exclusive source. *Winningham v. United States Dept. of Hous. & Urb. Dev., supra; Moreno v. United States Dept. of Agriculture*, 345 F.Supp. 310, 313 (D.D.C.1972) (three-judge court), *aff'd* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

The structure of the 1937 Housing Act, and the legislative history consisting of the Senate and House reports, lead this court to conclude that the Commerce Clause was a substantial constitutional basis for the Act. While the social objectives of the legislation were recognized and persuasive, see S.Rep.No.2160, 74th Cong., 2d Sess., 5 (1936); H.R.Rep.No.1634 (Conference Re-

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . . .

port), 75th Cong., 1st Sess., 1 (1937); S.Rep. No.933, 75th Cong., 1st Sess., 6 (1937), Congress was primarily concerned with the unemployment problems of the Depression era. A Senate report considered the first objective of the bill to be to provide opportunities for re-employment in the construction industry. S.Rep.No.933, at 2. The same report stated, "But every sign indicates that there can be no sustained period of prosperity without a concomitant revival of the building industry. This vicious cycle can be broken only with governmental assistance." *Id.* at 4. See also H.R.Rep.No. 1545, at 2 (". . . present and recurring unemployment will be relieved."). The Declaration of Policy in the original act expressed an intent to "alleviate present and recurring unemployment."

Today, the Act is still solidly based upon the Commerce Clause. In 1974, the Housing Act of 1937 was revised and consolidated with other housing statutes to form the Housing and Community Development Act of 1974. Pub.L. 93–383. One of the substantive amendments to the Housing Act of 1937, which retained its identity in the 1974 Act, was a shift in emphasis toward private development and management of housing for low income families. HUD recommended, and the Congress enacted, a statute which gives private developers the incentive for profit and risk of loss in low income housing. Should the Secretary so desire, the move toward stimulation of private construction may swallow most of the funding for an Act which originally envisioned federal aid to public housing agencies. 42 U.S.C. § 1437c(c) and § 1437f(b)(2).

The only court to consider this precise issue has reached a contrary result. In *Potrero Hill Community Action Comm. v. Housing Authority of City and County of San Francisco*, 410 F.2d 974, 979 (9th Cir. 1969), the Ninth Circuit held that the Housing Act of 1937 was not based on the Commerce Clause power of Congress, but on the welfare authority. However, this decision was reached without any reported analysis, and has been criticized as unpersuasive. See *Davis v. Romney*, 490 F.2d 1360 (3rd Cir. 1974); *Bloodworth v. Oxford Village Townhouses, Inc.*, 377 F.Supp. 709 (N.D.Ga. 1974).

More compelling is the result reached by the Fifth Circuit in *Winningham v. United States Dept. of Hous. & Urb. Dev., supra.* Plaintiffs were a class of residents of a federally subsidized housing project who challenged the constitutionality of a federal statute authorizing rent supplements for tenants moving to a subsidized housing project from substandard housing but not for tenants who had not previously lived in substandard housing. The court found jurisdiction lay under § 1337 as a primary purpose of the rent subsidy program and was to encourage new construction. That is a primary purpose of § 1437, and this court so holds.

■ Having cleared one hurdle, plaintiffs are faced with another: § 1337 does not of and in itself, create a cause of action. To create federal jurisdiction under this section, some federal right, be it constitutional, statutory, or "federal common law" must exist, independent of general rights emanating from the power of Congress to regulate commerce. *Gen'l Comm. of Adj. of Broth. of Loc. Eng. for Mo.-Kan.-Tex. R. Co. v. Mo.-Kan.-Tex. R. Co.*, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943). Defendants' 12(b)(6) motion to dismiss for failure to state a claim challenges the existence of a private right of action under 42 U.S.C. § 1437 to support § 1337 jurisdiction. No private cause of action is explicitly granted in the 1937 Housing Act, hence the question is whether one can be implied from the statute.

■ Whether a statute creates an implicit private cause of action requires a determination of the intent of Congress. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Although Congressional intent has always been the ultimate test, the Supreme Court has recently changed the scope and emphasis of the analysis. Since 1975, the lower courts have used the following factors cited

in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) as a guide to determining whether a private remedy is implicit in an act. First, whether plaintiffs are of the class for whose *especial* benefit the statute was enacted. Second, is there any indication of a legislative intent to create or deny such a right. Third, is it consistent with the legislative scheme to imply a private cause of action. Finally, is the cause of action one traditionally relegated to state law so that it would be inappropriate to infer a federal cause of action. Now, the emphasis of inquiry appears to have shifted to the first two factors. In *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), Justice Stewart wrote:

> While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, e. g., *J. I. Case Co. v. Borak,* [377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423] *supra,* what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear. (citations omitted). We accept this as the appropriate inquiry to be made in resolving the issues presented by the case before us.

*Id.* at 15, 100 S.Ct. at 245. See also *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J. dissenting). In *Transamerica,* after finding the class of plaintiffs was especially benefitted, the Court relied exclusively on the language of the statute and the legislative history to determine Congressional intent. Following many years of narrow reading of legislative intent, *Cort* promised to broaden access to the federal courts through judicial construction of the legislative will. That task appears to have been returned to Congress by *Transamerica.*

That plaintiffs are the intended beneficiaries seems clear. The benefits of the statute run to low income families through an indirect route, yet they are to receive the full benefits. A Senate report stated that slum dwellers and very low income groups were to be the beneficiaries, to the exclusion of lower middle income families. S.Rep.No.933, at 13. Since the eligibility requirements of the statute limit the recipients to a precisely, ascertainable group, plaintiffs meet the first test.

■ To determine Congressional intent, this court must look first, to the language of the statute. The only conduct proscribed by the statute itself, were the penalties in the original act for larceny of public moneys, defrauding the Housing Authority (now the "Secretary"), conflicts of interest, etc. Pub.L. 75–412, sec. 22–28. The thrust of these penalties is to protect the government, not plaintiff's class. No other prohibitions or proscriptions are mentioned, thus it becomes likely that no private remedy is available. *Touche Ross & Co. v. Redington,* 442 U.S. at 569, 99 S.Ct. at 2485. Under 42 U.S.C. § 1437d(g) the Secretary has remedies for substantial breaches of contract, but these remedies are narrowly drawn and would be of only indirect benefit to plaintiffs. This further compels a finding that it is improbable that "Congress absentmindedly forgot to mention an intended private action." *Cannon v. University of Chicago, supra,* 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting). For, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929).

Nor is the policy statement in § 1437 indicative of an intent to create a private remedy. While Congress recognized the need to improve lower income housing, the general policy statement is too amorphous to create a cause of action. *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir. 1974). Moreover, the primary purpose of § 1437 is to promote the general welfare by assisting the several States in their efforts to improve housing. Nothing in that language indicates low income residents were to acquire a statutory cause of action.

Plaintiffs have no remedies under § 1437. Their efforts to improve living conditions would be more soundly based on their status as tenants, third party beneficiaries to the "Contract," or as petitioners for administrative action by HUD. This leaves only the question of whether plaintiffs could prove a set of facts which would entitle them to relief under the Due Process Clause.

Plaintiffs interpret their complaint as alleging a violation of the Fourteenth Amendment's Due Process Clause, and assert this as a basis for 28 U.S.C. § 1331 jurisdiction. While it is true that the rights of tenants and applicants for public housing are protected by due process guarantees, see *Caudler v. Durham Housing Authority*, 433 F.2d 998 (4th Cir. 1970); *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968); *Ruffin v. Housing Authority of New Orleans*, 301 F.Supp. 251 (E.D.La.1969); *see also, Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973); *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); all of the cited cases speak in terms of "property" rights and procedural due process. The relief sought by plaintiffs is not for a hearing before the HACC. It is decent housing which has been denied them, not procedural due process. Their grievance would be more akin to a denial of "substantive" due process; a claim that it is unfair for HACC to allow George Legare Homes to deteriorate into indecent housing. Unfortunately for plaintiffs, the courts have never recognized such a right. It has been said that once housing legislation is enacted it must be administered fairly, that is, procedural due process must be followed but that the right to adequate housing is not constitutionally guaranteed and is a matter for the legislature. In *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), the Supreme Court held:

> We do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that docu-

ment any constitutional guarantee of access to dwellings of a particular quality . . . . . Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions.

*Id.* at 74, 92 S.Ct. at 874. In *Lindsey*, the tenants of an unfit building wished to withhold rent to force repairs from the landlord, but were chilled by an Oregon statute which allowed the landlord to evict them for non-payment of rent. They sought a declaratory order that the statute was unconstitutional. It was in this context, a fight over indecent housing, that the court found no constitutional guarantee. Due to the similar factual situations, the *Lindsey* language is applicable to the present plaintiffs, and their due process claim must fail. If the courts were to forge a constitutional right to decent housing, they would be guilty of an enormous usurpation of social policy decision making. While this court is entirely in sympathy with plaintiffs' plight, it cannot create a right. If Congress should decide to create a right to decent housing, this court will enforce it, but until then, the matter must be left to the landlord-tenant laws of the States.

Because plaintiffs state no claim under § 1437 or the Fourteenth Amendment, there is no independent ground for the assertion of § 1343(3) jurisdiction. The declaratory judgment jurisdiction which is dependent upon the existence of a federal issue, must also fail. Accordingly, since no federal issues exist, this court does not have pendent jurisdiction over the remaining claims. All claims must be dismissed for lack of jurisdiction.

AND IT IS SO ORDERED.