Willie B. EDWARDS, Jr., Queen Hayes, James Hayes, and Earl Jaspar Forney, Plaintiffs–Appellants,

and

James Garrett and James Dubose, Plaintiffs,

v.

JOHNSTON COUNTY HEALTH DEPARTMENT; W. Leon Powell, Jr.; Roy H. Warren; Richard H. Clayton, III; Stacy Covill; Ronald H. Levine, in his official capacity as State Health Director of the North Carolina Department of Human Resources; Helen Ray; Johnston County, Defendants–Appellees.

No. 88–3171.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1989.

Decided Sept. 20, 1989.

---

Robert J. Willis, Raleigh, N.C. (Farmworkers Legal Services of North Carolina) for plaintiffs-appellants.

Sueanna P. Peeler, Asst. Atty. Gen., Raleigh, N.C. (Lacy H. Thornburg, Atty. Gen., Pittsboro, N.C., William R. Britt, Smithfield, N.C., and Gordon C. Woodruff, Harron, O'Hale, Whittington & Woodruff, Benson, N.C., on brief), for defendants-appellees.

Before RUSSELL, Circuit Judge, HADEN, Chief United States District Judge for the Southern District of West Virginia, sitting by designation, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

ELLIS, District Judge:

Six black migrant farmworkers [1] appeal the dismissal of their claims against various county and state officials.[2] They contended below that appellees' practice of issuing permits for the establishment of substandard migrant housing facilities [3] violated the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–3619 (Title VIII), and their due process rights under the Fourteenth Amendment and 42 U.S.C. § 1983. The district court dismissed appellants' claims, finding that they failed to state a claim upon which relief could be granted. We affirm.

## I.

At issue is the appellees' allegedly illegal issuance of permits for two substandard migrant housing facilities.[4] During the spring and summer harvest seasons of 1985, appellants lived in these substandard facilities as a condition of their employment on two farms in Johnston County, North Carolina. Owners of the farms, as required by state law, had applied for and received state permits to operate migrant housing facilities from the Johnston County Health Department ("JCHD"). These permits issued after a JCHD representative inspected the two facilities and verified that they complied with state health and safety standards for migrant farm housing. Notwithstanding the issuance of the permits, neither facility satisfied those standards. Because appellees failed to ensure that the JCHD inspector responsible for issuing the permits was adequately trained and supervised, they thereby allowed the permitting of substandard housing. Appellees also failed to conduct adequate post-permitting inspections of these facilities to ensure continuing compliance with the state standards. As a direct result, appellants and other migrant farmworkers in Johnston County—more than ninety percent (90%) of whom are non-white—were effectively required to endure unsanitary and unsafe living conditions.

Appellants filed suit in the fall of 1985. Soon thereafter, appellees moved to dismiss appellants' claims, pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief could be granted. The state appellees also sought dismissal, pursuant to Rule 12(b)(1), Fed.R.Civ.P., of all claims against them in their official capacities on Eleventh Amendment grounds. Almost a year later, the district court dismissed all claims against the state appellees in their official capacities, but denied appellees' Rule 12(b)(6) motion to dismiss the remaining claims.[5] Subsequent

---

1. A migrant farmworker is defined as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A) (Cum.Supp.1989). *See also* N.C. Gen.Stat. § 130A–238(2) (defining "migrant" as "an agricultural worker, including a person who works in food processing operations, and a worker's dependents who travel and stay overnight in response to the demand for seasonal agricultural labor").

2. Appellees Roy Warren, W. Leon Powell, Jr., and Helen Ray are employees of the Johnston County Health Department ("JCHD"). Appellees Ronald Levine, Richard Clayton, III, and Stacy Covil are North Carolina Department of Human Resources employees who are responsible for supervising the JCHD's issuance of migrant farm housing permits under state law. *See* N.C.Gen.Stat. § 130A–4(b). Where a distinction is necessary between state and local officials, they are referred to as "state appellees" or "local appellees." Otherwise, they are referred to collectively as "appellees."

3. North Carolina law defines "migrant housing" as "one or more buildings or structures, tents, trailers or vehicles, together with the appurtenant land, that are established, operated or used as living quarters for 13 or more migrants." N.C.Gen.Stat. § 130A–238(3).

4. All well-pleaded, material facts in the Complaint are taken as admitted for the purposes of this review. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *United Land Corp. of America v. Clarke,* 613 F.2d 497, 498 (4th Cir.1980).

5. Pursuant to that Order, defendant Levine, who was sued only in his official capacity, was dismissed from the suit. Several other casting changes occurred during the course of this litigation. On October 7, 1986 and August 19, 1987, two other claims were dismissed for failure to respond to discovery. On June 5, 1987, Johnston County was added as an additional defendant. These casting changes do not affect resolution of the issues at bar.

motions by both parties for reconsideration of the Order were twice denied. More than two and a half years after suit was filed, however, the district court *sua sponte* reversed its earlier rulings and dismissed appellants' remaining claims for failure to state a claim.[6] Final judgment was entered on August 5, 1988. This appeal followed.

The following dispositive due process and Title VIII issues are addressed on appeal:

(1) Did appellees deprive appellants of a substantive due process right to safe and sanitary housing?

(2) Did appellees deprive appellants of a constitutional "liberty" interest without due process of law?

(3) Did appellees' practice of issuing unwarranted housing permits for migrant housing facilities effectively deny or make safe and sanitary housing unavailable for appellants on the basis of appellants' race, color, or nationality?

(4) Did appellees illegally discriminate against appellants in their provision of housing inspection services?

Each issue is discussed in turn.[7]

## II.

Appellants, relying on § 1983, claim appellees' actions represented local and state policies that denied them their substantive and procedural due process rights.[8] Specifically, appellants claim appellees deprived them of their right to "physical safety and mental and emotional health as a result of their exposure to the foreseeable risk of harm caused by the appellees' deliberately indifferent acts in the permitting of that migrant housing." The substantive due process claim necessarily assumes that appellees were constitutionally obligated, yet failed, to protect them from unsafe and unsanitary housing facilities. In the alternative, under the Due Process Clause's procedural component,[9] appellants claim they were deprived of a protected "liberty" interest in habitable housing without due process of law. The district court correctly held that neither allegation states a constitutional claim under § 1983.[10]

---

**6.** Not included in the Rule 12(b)(6) dismissal was an Equal Protection claim considered implicit in the Amended Complaint by the district court, but not explicitly pled. Appellees moved for reconsideration of that part of the dismissal order allowing suit to proceed on the Equal Protection claim. Appellants did not oppose the motion. The district court then dismissed this claim and entered final judgment.

**7.** The Court's affirmance of the district court's rulings on these issues renders it unnecessary to decide the remaining issues raised by appellants on appeal, namely (1) whether the district court properly dismissed, as barred by the Eleventh Amendment, appellants' claims for declaratory and injunctive relief under 42 U.S.C. § 1983 against the state officials in their official capacities; and (2) whether the district court abused its discretion by denying appellants' request, pursuant to Rule 30(b)(4), Fed.R.Civ.P., to record on videotape the deposition of non-party witness Samuel Johnson. We also do not reach appellees' motion of December 15, 1988, to dismiss appellants' appeal of the district court's Order dated November 28, 1986, dismissing, *inter alia*, appellants' claims for injunctive and declaratory relief against appellees Clayton, Covil and Levine in their official capacities. We deferred ruling on this motion until after oral argument. Because we do not reach appellants' appeal of this Order, appellees' motion to dismiss the appeal is denied as moot.

**8.** *See Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (municipal liability under § 1983 for constitutional violations only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."); *accord Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir.1987) (city liable under § 1983 for physical injuries inflicted on arrestee by police officer), *cert. denied,* — U.S. —, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).

**9.** *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("Whether any procedural protections are due [under the Due Process Clause] depends on the extent to which an individual will be 'condemned to suffer grievous loss.'") [quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (also quoted in *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970)) ].

**10.** On appeal, appellants contended that the doctrine of law of the case stripped the district judge of authority to reverse his earlier ruling that appellants had stated a substantive due process claim under the Fourteenth Amendment. This argument is without merit. As we noted in *Hill v. BASF Wyandotte Corp.,* 696 F.2d

## A.

■ Substantive due process rights are created only by the Constitution. *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985); *Youngberg v. Romeo,* 457 U.S. 307, 309, 102 S.Ct. 2452, 2454–55, 73 L.Ed.2d 28 (1982). And it is well-settled that the Constitution does not explicitly guarantee the availability of safe and sanitary housing. *See Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972); *Perry v. Housing Authority of the City of Charleston,* 486 F.Supp. 498, 503 (D.S.C.1980), *aff'd,* 664 F.2d 1210 (4th Cir. 1981). Nor have appellants pointed to any authority for inferring such a right. To the contrary, *DeShaney v. Winnebago County Dept. of Social Services,* —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), decided after the district court's ruling in this case, points persuasively away from such an inference where, as here, private actors, and not the State, have committed the underlying acts of which appellants complain. In *DeShaney,* the Supreme Court explained that

> "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."

*Id.* 109 S.Ct. at 1003. Thus, the court concluded, "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 1004. Significantly, the *DeShaney* court expressly rejected the notion urged here by appellants that an affirmative duty to provide adequate protective services arises out of "special relationships" created or assumed by the State

with respect to children under its child protection laws. *Id.; see, e.g., Jensen v. Conrad,* 747 F.2d 185, 194 (4th Cir.1984) (noting, in dicta, that a constitutional right to affirmative State protection may arise from a non-custodial relationship), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). Rather, the State's constitutional obligation does not arise until it "takes a person into its custody and holds him there against his will." *DeShaney,* 109 S.Ct. at 1005. Accordingly, the court in *DeShaney* rejected a claim by a child and his mother that the local Department of Social Services had a constitutional obligation to protect the child from his father. Although the Department had been investigating allegations of child abuse by the father, the child was not officially under the Department's protective services. Similarly, appellees here had no *constitutional* obligation to protect appellants from the living conditions in privately-owned migrant housing facilities. As appellants concede, appellees never assumed custody of them, nor did appellees place them in those substandard housing facilities. The facilities were operated solely by private owners with no financial support from the State. Under both federal and state migrant housing statutes, the burden for compliance with safety and health standards rested squarely on these private owners. Thus, in the context of these facts, *DeShaney* compels the conclusion that appellees' actions did not deprive appellants of any substantive due process right.

## B.

■ To establish a procedural due process violation, appellants must first establish the existence of a protected "liberty" or "property" interest and then show that appellees' actions deprived them of that interest. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711

287 (4th Cir.1982), "the true nature of the doctrine [of law of the case is] not ... jurisdictional." *Id.* at 290 n. 3. A district court clearly has the power to change a prior decision which is clearly erroneous and would result in substan-

tial injustice. *See Handi Investment Co. v. Mobil Oil Corp.,* 653 F.2d 391, 392 (9th Cir.1981). In reversing its Rule 12(b)(6) ruling, therefore, the district court acted well within its authority.

(1977). There is no suggestion that appellees deprived appellants of a "property" interest. Rather, appellants contend that North Carolina migrant housing laws and regulations created a protected "liberty" interest in habitable migrant housing. On close scrutiny, this contention fails. Protected "liberty" interests may arise only from the Due Process clause itself or from state laws.[11] *See Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); *Mills v. Rogers*, 457 U.S. 291, 300, 102 S.Ct. 2442, 2449, 73 L.Ed.2d 16 (1982); *Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–40, 49 L.Ed.2d 451 (1976). Here, the Due Process Clause does not create the interest for which appellants seek constitutional protection. *See Lindsey*, 405 U.S. at 74, 92 S.Ct. at 874; *Perry*, 486 F.Supp. at 503. But this conclusion does not end the constitutional inquiry, for "a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures." *Hewitt*, 459 U.S. at 469, 103 S.Ct. at 870.[12] Not every state statute or regulation creates a constitutionally protected interest. Mere procedural guidelines, for example, do not do so. *See Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. But mandatory state regulations or statutory directives which affect an individual's liberty may create a protected liberty interest for those individuals. *See, e.g., id.* at 471–72, 103 S.Ct. at 871. Appellants argue that the North Carolina migrant housing laws and regulations are sufficiently mandatory in nature to trigger constitutional protections for migrant farmworkers. Not so; this argument's fatal flaw is that it ignores that the state regulations requiring inspection and certification of private migrant housing facilities do not affect the migrant workers' liberty. Put differently, appellees' actions do not restrict the migrant workers' freedom to come and go as they please or to choose their housing or employment opportunities. Nor do the statutory and regulatory commands hinder efforts by private farmers to provide safe housing for their workers. Under these circumstances, we find no "liberty" interest created or infringed.

Our recent decision in *Milburn v. Anne Arundel County Dept. of Social Services*, 871 F.2d 474 (4th Cir.1989), supports this conclusion. There, an infant's parents voluntarily placed him with a state-licensed foster family through the state placement system. While in that home, the infant sustained significant injuries, apparently at the hands of his foster parents. The child's natural father sued, on the child's behalf, alleging violations of the child's rights under the Constitution and under federal and state statutes as a result of his placement in an abusive foster home. In affirming the district court's dismissal of the child's claim, we reasoned that the State,

> by the affirmative exercise of its power had not restrained the plaintiff's liberty; he was voluntarily placed in the foster home by his natural parents. And the injuries to the plaintiff did not occur while he was in the custody of the State of Maryland, rather while he was in the custody of his foster parents, who were not state actors....

*Id.* at 476. The same reasoning applies here. These appellees did not place appellants in their jobs or in the substandard housing provided by local farmers. Appellants were not in the custody or employ of the state or of state actors. Indeed, from the state's perspective, these workers were free to leave their jobs or their living arrangements at any time. No constitutional "liberty" interest was, therefore, implicat-

---

11. For this reason, appellants' due process claim based on the federal Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801–72, is meritless. Understandably, this claim was not pressed in briefs or argument.

12. *See, e.g., Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871–72 (protected liberty interest of state inmates in remaining incarcerated in the prison's general population); *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) (liberty interest in prisoner's "good-time credits"); *Moss v. Clark*, 698 F.Supp. 640, 652–53 (E.D.Va.1988) (same).

ed, much less infringed.[13] Accordingly, we have no occasion to reach appellants' claim that they were deprived of such an interest without constitutionally adequate procedures.

### III.

Appellants' Title VIII claim is premised on the alleged racially discriminatory impact of appellees' practice of authorizing substandard migrant housing for predominantly non-white migrant farmworkers. Title VIII forbids, in pertinent part, any effort

(a) to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, or national origin [or]

(b) to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or *in the provision of services* or facilities in connection therewith, because of race, color, religion, sex, or national origin.

42 U.S.C. § 3604(a) and (b) (emphasis added). Appellants argue that appellees have violated both subsections (a) and (b): Under (a), the claim is that appellees' approval of substandard migrant housing served to "make unavailable or deny" to appellants safe and sanitary housing "on the basis of [their] race, color, ... or national origin;" and under (b), it is that appellees effectively discriminated against migrant farmworkers "in the provision of [housing-related] services," namely, inspection services. Both claims must be rejected; neither is supported by the facts alleged in appellants' Amended Complaint, nor do they sufficiently state a claim under Title VIII.

### A.

■ To allege a violation of § 3604(a), appellants must assert, first, that appellees denied or made housing unavailable to appellants and, second, that appellees' actions were based on appellants' race, color, or national origin. As pled, their claim is deficient in two respects: (1) appellees did not "otherwise make unavailable" housing for appellants, and (2) appellees' actions did not have a racially disparate effect.[14]

---

**13.** *Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir.1969), the case primarily relied on by appellants, is inapposite. There, the Fifth Circuit held that migrant farmworkers had a private cause of action under 42 U.S.C. § 1983 against their employers and state officials based on alleged violations of the Wagner–Peyser Act of 1933, 29 U.S.C. § 49 *et seq.* That statute established a federal employment program to recruit, place, and transport migrant workers to private employers across the country. *Gomez,* 417 F.2d at 571. Each state in which migrant workers were to be placed through this program was *required* to ensure that safe and sanitary housing facilities were available for these workers. *See Gomez,* 417 F.2d at 571 n. 5. Given the statute's mandatory duty, the Fifth Circuit held that migrant workers had a § 1983 cause of action against state officials and employers "to protect their right to decent housing and sanitary living conditions ...," a right explicitly provided to workers by federal law. *Gomez,* 417 F.2d at 579. Here, in contrast, the federal law involved, AWPA, 29 U.S.C. §§ 1801–72, imposes no responsibilities and duties on these appellees. *See, e.g.,* 29 U.S.C. § 1823 (duty for compliance with migrant housing requirements rests with housing providers); 29 U.S.C. § 1854(a) (private right of action created explicitly against "a farm labor contractor, agricultural employer, agricultural association, or other person;" "person," in turn,

defined in § 1802(9) as "any individual, partnership, association, joint stock company, trust, cooperative, or corporation"). Thus, appellants have not and cannot fairly allege a § 1983 claim based on a violation of the AWPA.

**14.** As a threshold matter, appellees' argument that subsection (a) does not apply to them simply because they "do not own, rent or make housing available or unavailable" is without merit. Title VIII's proscriptions are not directed only to those persons who sell, rent or finance real estate. *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 549 (W.D.Va. 1975); *see also Smith v. Town of Clarkton,* 682 F.2d 1055, 1068 (4th Cir.1982) ("Governmental bodies are bound to uphold and obey the provisions of the Fair Housing Act's clear congressional mandate...."); *accord United States v. City of Parma, Ohio,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982); *United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1183–84 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). Governmental bodies and their officials have been held liable for violating its provisions. *See, e.g., Clients' Council v. Pierce,* 711 F.2d 1406 (8th Cir.1983) (HUD violated Title VIII by continuing to fund racially discriminating housing authority); *Smith v. Town of Clarkton,* 682 F.2d at

With respect to the first prong, appellants do not contend that appellees literally made migrant housing facilities unavailable. Such a contention would plainly be false for appellees' issuance of state permits actually helped make *available* migrant housing facilities, albeit substandard ones. More fundamentally, there is no assurance that adequate migrant housing would become more available even if appellees had properly applied the statutory housing quality standards. Simply put, the state has no duty under the existing statutory scheme to make migrant housing available; it cannot compel farmers to provide such housing. Appellees' obligation only arises if farmers choose, on their own, to provide housing. In short, there is no causal link between the improper or improvident issuance of permits and the unavailability of migrant housing.[15]

Because appellants cannot allege that appellees literally made housing unavailable, they allege instead that appellees effectively made *habitable* housing unavailable. To support this, appellants must argue that Title VIII proscribes more than its plain language suggests: Title VIII, they argue, implicitly precludes appellees from permitting substandard housing on discriminatory grounds because doing so precludes migrant workers, who must live in the substandard housing furnished by the farmers,[16] from obtaining adequate housing elsewhere. This argument requires an expansion of the statutory language, for which appellants rely only on the general principle that Title VIII, like most of its other civil rights counterparts, should be broadly construed to effectuate the statutory purpose. *See Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972); *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 548 (W.D.Va.1975). But our review of the relevant legislative history and decisional authority demonstrates that the expansion proposed by appellants is unwarranted.[17] And appellants have cited no authority to the contrary.[18]

1065–66 (town's withdrawal from multi-municipality low-income housing authority project violated Title VIII); *Baker v. City of Kissimmee,* 645 F.Supp. 571 (M.D.Fla.1986) (city violated Title VIII by intentionally discriminating in the provision of housing-related services).

**15.** There may be a causal link, however, between the improper *refusal* to issue permits and the unavailability of migrant housing. Thus, a different result would obtain if the facts showed either that appellees *refused* permits for adequate housing and did so out of racial animus, *cf. Smith v. Town of Clarkton,* 682 F.2d 1055 (4th Cir.1982) (town's racially-motivated withdrawal from multi-municipality housing authority violates Title VIII), or that appellees refused permits for adequate housing for minority workers while approving permits for facilities housing predominately white workers, *cf. Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir.1988) (town's refusal to amend zoning ordinance restricting construction of multi-family housing to largely minority area violates Title VIII).

**16.** Farmers in this case required migrant workers to live in the housing they furnished as a condition of employment.

**17.** For a summary of Title VIII's legislative history, see Dubofsky, *Fair Housing: A Legislative History and a Perspective,* 8 Washburn L.J. 149 (1969).

**18.** Appellants' authorities are neither on point nor analogously persuasive. The decision in *Gomez, supra* note 13, relies on the Wagner–Peyser Act's provisions explicitly creating a right to a certain standard of housing for migrant workers in the federal migrant placement program. No analogous federal statutory scheme is applicable in the case at bar. And in *Clients' Council v. Pierce,* 711 F.2d 1406 (8th Cir.1983), the Title VIII liability of the federal Department of Housing and Urban Development (HUD) was predicated on a completely different statutory section, § 3608, which mandates that HUD take affirmative steps to promote the policies of Title VIII. Moreover, HUD's role was far more direct than the role of appellees in the case at bar. There, a local housing authority administering HUD-approved and HUD-financed programs racially discriminated in its low-income housing programs for more than a decade. *Id.* at 1423, 1425. Despite this, HUD continued to fund the authority and took no action against it in violation of § 3608's mandate. From this, the Eighth Circuit inferred discriminatory intent in violation of the Fifth Amendment. Here, in contrast, there is no state or local government mandate to provide housing. Nor was there any state effort to do so. Moreover, the state did not fund the establishment of migrant housing facilities. And there is no contention that appellees ever discouraged farmers from providing housing to migrant workers. Instead, appellees' role here is limited to inspections of private facilities after the housing owner files a state permit

There is a further and equally fatal flaw in appellants' § 3604(a) claim. They have not sufficiently alleged that appellees' actions were "based on [appellants'] race, color ... or nationality." Appellants do not suggest that appellees acted with a racially discriminatory intent. Of course, absence of discriminatory intent is not necessarily fatal to a Title VIII discrimination claim. *See Betsey v. Turtle Creek Associates,* 736 F.2d 983, 986 (4th Cir.1984); *Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065 (4th Cir.1982); *accord Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.1988). A facially neutral housing-related policy may nonetheless violate Title VIII if it has a disproportionate adverse impact on minorities. *Betsey,* 736 F.2d at 986; *Smith,* 682 F.2d at 1065.[19] Such an impact may take one of two forms: (1) a facially neutral decision may have "a greater adverse impact on one race than another," or (2) it may "perpetuate[ ] segregation and thereby prevent[ ] interracial association [in the entire community involved]." *Betsey,* 736 F.2d at 987 n. 3 [citing *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*)].

Appellants allege only the first form of impact, namely, that appellees' actions have a greater adverse impact on non-white migrant farmworkers than on their white colleagues. The standard by which this greater adverse impact allegation must be tested is "whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Betsey,* 736 F.2d at 987. Given the facts pled, the allegation fails to pass muster under this test. In the case at bar, the state permit requirement applied only to migrant housing facilities in North Carolina, and the sharp focus of appellants' claims is the migrant housing facilities in Johnston County.[20] To allege a valid disparate impact claim, appellants must therefore contend that appellees' actions had a greater adverse impact on minority migrant farmworkers in Johnston County than on that county's white migrant farmworkers. Yet, nowhere in the Complaint do appellants contend that the appellees' actions affected non-white migrant farmworkers to a greater *degree* than white farmworkers. Nor could such a contention reasonably be made; manifestly, white and nonwhite migrant workers suffered the same *degree* of harm because they shared the same substandard housing. It is true, of course, that a majority of migrant farmworkers are non-white. And given this, any policy or action taken with respect to these workers will necessarily affect more non-white than white migrant farmworkers. But merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another. *See Huntington,* 844 F.2d at 938 (the disparate impact analysis requires looking beyond the absolute numbers of white and minority victims to analyze "the disproportionate burden on minorities"); *cf. Wards Cove Packing Co., Inc. v. Atonio,* — U.S. —, 109 S.Ct. 2115, 2122, 104 L.Ed.2d 733 (1989)

---

application. That limited role does not trigger Title VIII responsibility for the quality of the housing facilities actually provided.

**19.** *Accord Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*); *Residents Advisory Bd. v. Rizzo,* 564 F.2d 126 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir.1976); *United States v. City of Black Jack,* 508 F.2d 1179, 1183 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Kennedy Park Homes Assoc., Inc. v.*

*City of Lackawanna,* 436 F.2d 108 (2d Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).

**20.** Appellants contend the relevant comparison should be between all migrant farmworkers in North Carolina or throughout all southern states where migrant workers are employed and the general population in those states. Such a comparison is not appropriate where, as here, the appellees are, in part, county officials responsible for issuing permits for migrant housing only in Johnston County, North Carolina and the only farms with which appellants were involved were located in Johnston County.

(In a Title VII case, "[r]acial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions. . . ."). And appellants have failed to allege more than statistical disparity. They do not, for example, claim that appellees have somehow approved substandard housing only for minority migrant workers while rejecting substandard housing for white migrant workers or other white citizens. Indeed, appellants concede that white and non-white workers were equally affected.

Equal adverse impact on white and non-white citizens is not automatically fatal to a Title VIII disparate impact claim; the disputed policy may still produce a racially discriminatory impact in the second sense, that is, it may contribute to continued housing segregation or impede integration efforts. *See, e.g., Arlington Heights II,* 558 F.2d at 1291; *Huntington,* 844 F.2d at 937–38 (despite greater numbers of low-income white than low-income minority citizens, zoning ordinance limiting new multi-family housing construction to largely minority urban renewal area effectively "impedes integration by restricting low-income housing needed by minorities to an area already 52% minority"); *Black Jack,* 508 F.2d at 1183–86 (although zoning ordinance affected almost equal percentages of black and white low-income citizens, ordinance had a racially discriminatory impact because its ultimate effect was to impede integration efforts). But here appellants do not allege that appellees' actions effectively perpetuated segregation or impeded integration efforts among migrant workers or within Johnston County. Nor is there any basis for an allegation. Appellants have, therefore, failed to state a claim of racially discriminatory effect under Title VIII.

### B.

■ Appellants similarly fail to allege that the appellees discriminated in the provision of services "in connection with a dwelling" against appellants on the basis of their race, color, or nationality, in violation of § 3604(b). The § 3604(b) "services" claim was neither specifically pled nor argued below. Count II of the Amended Complaint refers generally to § 3604, but tracks the language of § 3604(a). Appellants' declaratory relief request seeks a declaration of rights under § 3604(a), not § 3604(b). The "services" claim, it appears, was first raised on appeal. On this basis alone, it deserves rejection. To rule otherwise stretches the limit of notice pleading beyond the breaking point. *See Eastern Publishing & Advertising, Inc. v. Chesapeake Publishing & Advertising, Inc.,* 831 F.2d 488, 493 (4th Cir.1987) (appellate review of Rule 12(b)(6) dismissal of an antitrust claim refused to consider "other alleged competitors because their existence and injury were not averred in the complaint nor in any way suggested to the district court"), *vacated on other grounds,* —— U.S. ——, 109 S.Ct. 3234, 106 L.Ed.2d 582 (1989). In any event, we dispose of this new ground on the merits because it, too, plainly fails to state a claim.

Even if the inspection and permit services provided by these appellees fall within the scope of Title VIII,[21] appellants make no allegation that identical or even analogous services were required and competently provided solely on behalf of white migrant workers or other white residents in Johnston County. Nor did they allege that appellees' failure to provide these services affected non-white migrant workers to any greater degree than it affected white migrant workers, or even that this failure produced a segregative effect or impeded integration efforts. Absent such showings of racially discriminatory impact,

**21.** Because we hold that appellants have failed to allege a disparate impact in the provision of housing-related services, we do not reach the question of whether the inspection services provided by these appellees constitute "services" under Title VIII. *See Mackay v. Nationwide Ins. Cos.,* 724 F.2d 419, 424 (4th Cir.1984) ("[the word 'services'] encompasses such things as garbage collection and other services of the kind usually provided by municipalities"); *Baker v. City of Kissimmee,* 645 F.Supp. 571 (M.D.Fla. 1986) (found intentional discrimination within the meaning of Title VIII in the provision of street paving and maintenance services).

appellants' allegations with respect to "services" under subsection (b) also fail to state a Title VIII disparate impact claim.

### IV.

Unsafe and unsanitary migrant worker housing is a social problem that has understandably prompted action by Congress [22] and some states.[23] This legislative action has, in some instances, provided remedies against those who provide substandard housing. In affirming the district court's dismissal of appellants' claims, we hold only that the constitutional and Title VIII claims asserted against these appellees fail to state a claim upon which relief can be granted. We express no view on the merits or applicability of any other remedies appellants may have.

AFFIRMED.

---

**22.** *See, e.g.,* AWPA, 29 U.S.C. §§ 1801–72.

**23.** *See, e.g.,* Fla.Stat. § 381.422–381.482 (1988); N.C.Gen.Stat. §§ 130A–238 to 130A–242; Tex. Rev.Civ.Stat.Ann. art. 5221e–1 (1987).